**Melvin BALDWIN, et al., Plaintiffs,**

v.

**LOCAL 843, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, etc., Defendant.**

**Civ. No. 78–420.**

United States District Court, D. New Jersey.

Aug. 18, 1982.

37

Glen J. Vida, Union, for plaintiffs.

Barry A. Aisenstock, Rothbard, Harris & Oxfeld, Newark, for defendant.

## OPINION

BIUNNO, Senior District Judge.

This is a suit by various members of defendant Local 843 to recover the amount of wages and other benefits which were lost when Local 843 required its members to honor a picket line despite an agreement with the employer not to do so.

The case was tried to the court without a jury, on the basis of certain facts not in dispute set out in the pretrial order, various exhibits (including pertinent transcript) in a proceeding before the NLRB, and depositions with exhibits taken in this cause. Trial was limited to the issue of liability only, although plaintiffs have included a tabulation outlining the nature and extent of the items claimed. See Exh. D.

The events surrounding this matter have been the subject of at least two other proceedings. One was a suit by Local 843 against the employer, Anheuser-Busch, Inc., filed in Superior Court, Chancery Division, Essex County and removed to this court by the employer on about March 17, 1976, where it became Civ. No. 76–492. The other was a consolidated proceeding on two cases before the NLRB, in which it was determined that the action of Local 843 in imposing fines and suspensions on four members who crossed the picket line invaded rights guaranteed to them by Section 7 of the National Labor Relations Act (29 U.S.C. § 157) and was a violation of Section 8(b)(1)(A) of that Act (29 U.S.C. § 158) as an unfair labor practice.

The employer, Anheuser-Busch, is a Missouri corporation engaged in the brewing of malt beverages at various locations one of which is a brewery at Newark, N.J., where some 1,340 persons were employed in 1975–1976. Of those represented by a collective bargaining agent, the units involved a total of 5 representatives. Of the 5, two were affiliated with the Teamsters, and these acted for members involved in the main operations. Steamfitters were represented by Local 475, United Association, etc., stationary engineers and oilers by Local 68, Operating Engineers, and laborers by Local 342, Laborers International.

The two representatives for "brewery" personnel were:

... Brewery Workers Joint Local Executive Board of New Jersey (Teamsters), hereafter "Joint Board"

... Brewery Workers Local 102 (Teamsters).

As the papers on file in Civ. 76–492 make clear,[1] it is the "Joint Board" which is the certified collective bargaining representative, and not Local 843 or Local 153, whose members are represented by the Joint Board. It also appears in the recitals to the agreement dated January 12, 1976, which is the last page of the excerpts from the contract at Exh. C to plaintiffs' Appendix.

There were collective bargaining agreements in effect for the Newark brewery which ran to the end of February, 1976 for the Joint Board and Local 102, and to April 30, 1976 for the steamfitters and laborers. The date for the operating engineers does not appear.

In any event, the employer decided in early Fall of 1975 to seek negotiation and agreement as long before the contract expiration date as possible. As an incentive it offered to put negotiated increases into effect before the existing contract expired and, in case other employees achieved greater increases later, to grant parity at that time to those who settled early. In exchange, it sought an agreement not to honor or support any picket line whose object it was to exert pressure on the employer to come to agreement on another collective bargaining agreement. This was embodied in a letter dated December 3, 1975 to Mr. Sullivan at the Joint Board, and signed by him after the new agreement, including the letter agreement, had been ratified in late January, 1976, effective January 12, 1976.

---

1. The court takes judicial notice of its own records, *Wells v. U.S.*, 318 U.S. 257, 63 S.Ct. 582, 87 L.Ed. 746 (1943).

The same course was taken with Local 102, whose negotiators evidently agreed but whose membership rejected the settlement and in late February, 1976 voted to strike and picket Newark, which began March 1, 1976.

Although there was no labor dispute between the employer and the Joint Board or any employee represented by it, those employees engaged in a work stoppage by honoring the picket line of Local 102. In addition, employees represented by the steamfitters and laborers whose contracts ran to April 30, 1976, also did not cross Local 102's picket line and failed to report for work.

Part of the new contract with the Joint Board involved the employer's withdrawal from a pre-existing welfare trust fund and the establishment of a new one on February 1, 1976. When the work stoppage occurred, the employer sent letters to its employees under date of March 3, 1976, informing them that coverage had been suspended temporarily and for the duration of the work stoppage. The coverage included at least hospital, surgical, medical, dental and life insurance, and arrangements were made for the coverage to continue during the temporary suspension at the employees' own expense for the premiums.

That letter triggered the complaint that became Civ. No. 76–492 in this court, by which Local 843 sought a preliminary injunction to compel the employer to continue the coverage.

The issue in dispute then was not decided on the merits. The court denied the preliminary injunction and left the parties to the contractual arbitration procedure. See rulings dated March 29 and April 28, 1976, attached. In early 1977, that case was discontinued as the matter was in arbitration. The outcome of that arbitration is not known.

What happened later is outlined in the decision of the administrative law judge in the NLRB proceeding conducted in January, 1977.

After Local 102 went on strike, and set up its picket line, none of the plaintiffs or other Local 843 members reported for work. Agreement with Local 102 was evidently reached on May 8, 1976, but before work could resume, the Joint Board was informed by the Brewery Workers Conference, which did not represent any employees at Newark, that a picket line was to be set up there by members of Local 633 from the Merrimac, N.H. brewery, where no agreement had yet been reached. This picket line was evidently set up May 11, 1976 (or so) and continued until June 3, 1976.

Evidently four members of Local 843 crossed the picket line of Local 633 to report for work: these were Fred Cosenza, Joseph Calabrese, Melvin Baldwin and James C. Brown. Charges were filed and they were put on probationary membership and fined. Cosenza and Baldwin filed charges on July 8 and August 23, 1978. A consolidated complaint was issued September 14, 1976 and the hearings were held as to all four members mentioned, with the result that Local 843 was ordered to rescind and expunge the fines and suspensions.

A panel of NLRB affirmed the rulings, findings and conclusions of the ALJ and adopted his recommended Order with modifications, under date of September 30, 1977. This suit was filed in the early part of 1978.

*Jurisdiction.*

At the argument and colloquy during the trial presentation, defendant questioned the court's jurisdiction and indicated that the subject would be briefed. However, when the brief was received after an extension of time, the matter of jurisdiction was not discussed. Despite this, since this court's jurisdiction is a limited one, it is obliged to consider the question independently.

Plaintiffs assert jurisdiction under § 301 of the LMRA, 29 U.S.C. § 185, and ground their claim against defendant on the duty of fair representation, citing *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

█ There are several difficulties with plaintiffs' position. The first is that § 301

does not establish any duties or create any rights at all. It is merely a jurisdictional provision enabling certain kinds of suits against labor unions to be brought in federal court, as they could always have been brought in a state court. The legislative history shows that the main concern was that in some states a suit against a labor union could not be brought unless process were served on every member—a requirement that had the practical effect in some cases of making such suits impossible.[2]

■ Rather, recognition of the duty of fair representation originally grew out of the Railway Labor Act and the provisions in it which empower the unions to bargain exclusively for all employees in a particular bargaining unit. This designation subordinates the individual interests to the interests of the unit as a whole and requires that there be imposed on the unions a correlative duty, inseparable from the exclusive authority to represent the unit, to exercise that duty fairly. This relationship was first spoken of by the Supreme Court in *Steele v. Louisville, etc.,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944).

The same reasoning was applied to labor unions whose status as exclusive representatives rests on the National Labor Relations Act rather than the Railway Labor Act. The same exclusive power to represent all employees in a bargaining unit gives rise to the same correlative duty of fair representation, see, e.g., *Syres v. Oil Workers,* 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785 (1955); *Nedd v. U.M.W.,* 400 F.2d 103 (CA 3, 1968).

■ There are many references to *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) as though it had decided that a claim against a union for breach of duty of fair representation arises out of § 301 and may be brought in a federal court on that account. Unfortunately, that view is not correct. *Vaca* was a state court

action against a union alone, it was not filed in federal court under § 301 and the only question decided was that the breach of duty, while amounting to an unfair labor practice within the jurisdiction of the NLRB, was not solely remediable there but could also be vindicated by a suit against the union.

*Vaca* does contain a good deal of what has proven to be influential dictum about suits against the employer under § 301 and joinder of a claim against the union in the same suit. It is also the source of the controlling law that an actionable breach occurs only when the conduct is arbitrary, discriminatory or in bad faith.

It should also be noted that in connection with cases involving mandatory arbitration provisions and no-strike clauses, the Supreme Court has spoken of § 301 as the vehicle through which national labor policy is to be fashioned by the courts as federal law, rather than state law, although compatible state law may be absorbed and applied as federal law, see *Textile Workers v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957); *Avco Corp. v. Aero Lodge,* 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968).

The fact remains, however, that not every dispute between an employee and the union is a federal claim coming within § 301. See, e.g., *Medlin v. Boeing Vertol Co.,* 620 F.2d 957 (CA 3, 1980). Even in upholding jurisdiction over a suit for violation of a constitution as a contract between labor organizations, the Supreme Court was careful to note that it did not need to say "that every contract imaginable" is within § 301(a). See, *Plumbers & Pipefitters,* 452 U.S. 615, at 627, 101 S.Ct. 2546, at 2553, 69 L.Ed.2d 280 (1981).[3]

One of the difficulties here is that the defendant, Local 843, is neither a party to the collective bargaining contract (including

---

**2.** This was not the case in New Jersey. See *Harris,* "Pleading and Practice in New Jersey", (N.J.Law School Press, 1926), sec. 85, citing N.J.Comp.Stat. of 1910, p. 4064, sec. 40; the same method applies today, N.J.Court Rule R. 4:4–4(c)(2).

**3.** The most recent opinion discussing the subject is *Bowen v. U.S. Postal Service,* —— U.S. ——, 103 S.Ct. 588, 74 L.Ed.2d 402 (1983), reversing 642 F.2d 79 (CA 4, 1981), which had affirmed in part and reversed in part, 470 F.Supp. 1127 (D.Va.1971).

the "no-strike" letter dated December 3, 1975) with Anheuser-Busch, nor is it the exclusive collective bargaining agent on that contract on behalf of plaintiffs. The exclusive bargaining agent was the Joint Board, and it is also the party acting on behalf of the employees.

Exh. P–1, the collective bargaining agreement involved, contains the following recital:

"Article I. Recognition. 1.1 The Union is recognized as the sole and exclusive collective bargaining agent of the employees of Anheuser-Busch, Inc., in a unit for which the Union was certified by the National Labor Relations Board on March 9, 1953."

The caption of the agreement names only the "Brewery Workers Joint Local Executive Board of New Jersey", with no mention of Local 843 or Local 153. Many of the provisions, such as those for union security, refer to "the Union or the Local designated by the Union."

See, also, the opening sheet, which is at the end of the contract excerpts of Exh. C to plaintiffs' Appendix, setting out the explicit recital. This sheet is not included as part of the copy marked at trial, but it is plainly the first page after the cover page. The signature page is also in Exh. C to plaintiffs' Appendix, but not part of the exhibit marked at trial, for unknown reasons. It, too, shows only the Joint Board as the party signing for the employees of the unit as certified.

Another difficulty is that even assuming that Local 843 were the exclusive representative and that it were a party, the suit here can hardly be regarded as one for violation of a contract between an employer and a labor organization representing employees in an industry affecting commerce. The letter agreement was a modification of certain provisions in the basic contract by which the Union and the employees for whom it acted, gave up the right to honor a picket line under specified conditions, with provision that any employee who honored such a picket line would subject himself to discipline.

The picketing by Local 102 is said not to be covered by the letter because the collective bargaining agreement that Local 102 was negotiating for and picketing for was not for employee classifications covered by the Joint Board contract. The court notes, however, that in the 1976 lawsuit, Civ. 76–492, the employer took the position that the Local 102 picket line should not have been honored.

The Local 633 picket line set up for the New Hampshire brewery, did deal with an agreement applying to employee classifications covered by the Joint Board contract and should not have been honored. Under section 7 of the LMRA, 29 U.S.C. § 157, employees have the statutory right to refrain from protected activities, and by section 8(b)(1)(A) it is made an unfair labor practice for a labor organization to restrain or coerce employees in the exercise of rights guaranteed in section 7, see 29 U.S.C. § 158(b)(1)(A).

■ The employer, however, did not act in any way shown on the record to attempt to enforce the contract. It evidently paid those who crossed the picket line and reported for work, but it did not undertake to discipline any employee for honoring the picket line and thereby participating in a work stoppage to assist Local 633 to put pressure on the employer.

Thus, although the contract involved is between an employer (Anheuser-Busch) and a labor organization (the Joint Board), the fact that the employer chose to disregard the breach means that this suit is not one "for violation" of the contract and so there is no jurisdiction under § 301.

■ Nor is there jurisdiction on the theory that the duty of fair representation grows out of the statutory power of exclusive representation for the bargaining unit so as to bring the suit within 28 U.S.C. § 1337. That section vests jurisdiction over civil actions arising under any Act of Congress regulating commerce. The reason is that the "labor organization" which was the exclusive representative for the unit was the Joint Board, not Local 843. Such duty

as is implied was a duty of the Joint Board, not of Local 843.

*The Merits.*

On the assumption that jurisdiction exists, prudence dictates that the merits be addressed.

Although not the certified exclusive representative for the unit, Local 843 is a union whose members were part of the unit, along with members of Local 153. Its president, Frank Sullivan, conducted the negotiations for the Joint Board and signed the contract on its behalf. Local 843 cannot plead ignorance of the negotiations or of the terms of the agreement.

The record of testimony is clear that the subject of a letter commitment not to recognize outside picket lines came up at the first negotiation meeting on October 8, 1975 and was an essential quid-pro-quo for early settlement even before the existing contract expired. The contract and the letter were put to a ratification vote to the members of Local 843 and Local 153 to be voted up or down together.

The entire context is eloquent in the awareness of the employees in the unit of the values of not only achieving increases before the old contract went out and of assurance of parity if others did better, but also of the value to both the employer and them of uninterrupted employment.

Everyone familiar with the subject of labor relations, and most of all the rank and file, are well aware of the powerful weapon, under some circumstances, of the strike, the walkout, the slowdown or the sitdown and other variations on the theme. They are also well aware of the risks. Just as labor sometimes says "no contract, no work", the employer says "no work, no pay." And so, there are some work interruptions due to labor disputes that last so long that even with the pay increase finally achieved, it takes years for the workers to make up, through the increase, what they lost in wages while out of work. Sometimes the employer can neither meet the demands nor absorb a strike and the result is that the enterprise shuts down entirely.

Thus, in the circumstances of this case, the certified representative negotiated a package, including the letter commitment, and submitted it to the employees in the unit. The employees making up the unit twice rejected the package, then accepted it on January 25, 1976. They were led to expect that, by signing up, they could avoid the risks of lost work, if Local 102 signed up early, and when it did not they knew that chance was lost but certainly expected to be able to continue work after Local 102 settled, despite problems at out of state plants. They had voted, back in 1975, not to give negotiating authority for the upcoming contract to the National Brewery Conference, but to negotiate themselves. The vote was evidently unanimous.

Thus, when Local 843 officers undertook to inform plaintiffs that the Local 633 line should be honored, to police the plant to identify which employees went through the picket line, and then accepted and processed charges leading to fines and probation, they frustrated the plaintiffs' natural expectations in light of that history.

The plaintiffs wanted to carry out the contract that the Joint Board had negotiated on their behalf and which they had approved. They wanted to work and earn their pay, but the conduct of the Local 843 officers prevented that.

The telegram of February 2, 1976, sent by the Teamsters' General President to Local 843, speaks of the December 3, 1975 letter as a "provision which purports to waive the trade union right of your individual members to respect a picket line of other Teamster locals who may strike during the current negotiations with Anheuser-Busch." Of course, that right of individual members is protected by 29 U.S.C. § 157 equally with the right to agree not to exercise it. Since the right is guaranteed by statute, neither Local 843 nor the General President of the Teamsters had authority to take the right away.

Consequently, if there were jurisdiction, which the court concludes there is not, it would enter judgment on liability in favor

of plaintiffs and against defendants. The basis for that liability under the circumstances of this case would be, not a breach of the duty of fair representation but a tortious interference with an opportunity to work and earn each day's pay under the collective bargaining agreement negotiated by the Joint Board and endorsed by the employees for whom it was representative. It is fundamental to sound labor relations that the promises made by management and labor be honored. The employees here made a promise but Local 843 prevented them from honoring it, and should be held liable, if there were jurisdiction, for the ensuing loss of earnings.