Prentice OSBORNE, Respondent,

v.

WAREHOUSE, MAIL ORDER, ICE, COLD STORAGE, et al., and Local Union No. 838, Appellants.

No. WD 33982.

Missouri Court of Appeals, Western District.

Jan. 24, 1984.

Motion For Rehearing and/or Transfer to Supreme Court Overruled and Denied Feb. 28, 1984.

Application to Transfer Denied April 16, 1984.

See also Mo.App., 622 S.W.2d 34.

Lawrence H. Pelofsky, Kansas City, for appellants.

Stewart M. Stein and Richard E. Standridge, Kansas City, for respondent.

Before MANFORD, P.J., TURNAGE, C.J., and KENNEDY, J.

KENNEDY, Judge.

Plaintiff Prentice Osborne had a jury verdict against the Warehouse, Mail Order, Ice, Cold Storage, et al., and Local Union No. 838, for $30,000 damages upon his claim that the union failed fairly to represent him in his complaint that his employer, Belger Cartage Service, had wrongfully discharged him.

From the ensuing judgment the union has appealed, claiming that plaintiff failed to make a submissible case, and claiming that the jury was improperly instructed as to damages.

The points raised require a fairly detailed statement of the facts:

Plaintiff was a trash truck driver for Belger Cartage. He had been so employed for three and a half years. He was a member of defendant union. The contract between the union and the employer provided that an employee could be discharged only for "just cause". It also required that employees were entitled to be paid full wages by the employer during any time they were "required to be absent from work because of jury service", less the amount received for jury fees.

Plaintiff was summoned for jury service in Wyandotte County, Kansas, for a period beginning August 9, 1976. He served on a jury on August 9 and 10. He was then excused from attendance but was instructed to stand by and await a call to return. Osborne testified that it was his understanding that he was to remain at home awaiting a call. This understanding was based upon his having "given them my home phone number and I could report for jury service as soon as possible". He remained at home throughout the week. On Friday of this week he showed up at the Belger office at about noon for his paycheck. He was asked by his supervisor to work the remaining four hours of the work day. He refused, explaining that he was on standby jury duty and was not dressed for work. He returned to the courthouse on the following Monday. When he was not chosen for jury duty that day, he was excused for the remainder of the week and

told he could return to work. He did return to work and worked the remainder of that week.

Plaintiff was fired by Belger on the following Monday morning for failing to return to work while he was on standby jury service.

It is tacitly agreed by the parties that in Wyandotte County jurors on standby may return to their work and do not remain at home. The parties also assume that if Mr. Osborne was in good faith mistaken on this point, and reasonably and honestly believed he was required to remain at home, then his discharge was without "just cause" and he would have been entitled to reinstatement. Larry Belger, executive vice-president of Belger Cartage, told Osborne before he discharged him that Osborne was "trying to beat him out of something". In his testimony at the trial, Belger gave as his reason for Osborne's discharge his "dishonesty". Much of the testimony on the trial revolved around the issue of plaintiff's good faith.

1. *Submissibility of case for breach of duty of fair representation.*

With that background, we can take up appellant's specific contentions on this appeal, the first of which challenges the sufficiency of the evidence to make a submissible case against the union.

To get in mind the duty of fair representation owed by a labor union to its employee member who has a grievance, we quote from *Vaca v. Sipes,* 386 U.S. 171, 190–191, 87 S.Ct. 903, 916–17, 17 L.Ed.2d 842 (1967):

A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith....

Though we accept the proposition that a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion...

See also *Bowens v. U.S. Postal Service,* —— U.S. ——, 103 S.Ct. 588, 74 L.Ed.2d 402 (1983); *Griffin v. International U., United Automobile A. & A.I.W.,* 469 F.2d 181,

183 (4th Cir.1972); *Sanders v. Youthcraft Coats and Suits, Inc.*, 700 F.2d 1226, 1229 (8th Cir.1983).

The case was submitted to the jury upon a verdict-directing instruction (of which there is no complaint upon this appeal) which required the jury to find that "defendant's conduct in handling plaintiff's grievance was arbitrary, discriminatory or in bad faith and ... because of such conduct, plaintiff was not fairly represented..."

We now take up our narrative at the point of plaintiff's discharge, keeping in mind the union's duty of reasonable diligence articulated in the preceding paragraphs.

After his discharge, which was August 23, Osborne went that afternoon to the union hall and explained the matter to Gayle Crawford, a business representative of the union, who told him to "get some proof verification that you were on jury duty, and so forth, and bring it back, and we'll take it from there". In compliance with Crawford's suggestion, plaintiff went the next morning to the courthouse and talked with court administrator Richard B. Shannon. Shannon wrote a letter, addressed "To Whom it may Concern", in which he stated:

> Mr. Prentice C. Osborne, Jr. reported for jury duty on August 9th and served through the 10th. He was placed on standby (telephone call) for the 11, 12, and 13th. He reported again and was directed to appear on the 16th and released for the 17th on.
>
> Normally I instruct the jurors on the first day (10th) but I was out of town and the jury clerk took over the task. Mr. Osborne could have reported to work on the 11th, 12th & 13th if we had his phone number at his place of employment. However, this was the first time for the jury clerk to explain the procedure. It has since become evident that she did not explain satisfactorily (sic) the "standby" status rules, and consequently some jury member, maintained this status was to be at home for telephone calls.

This misunderstanding is our fault and should not be held against Mr. Osborne, as I am sure he acted in good faith.

Osborne hand-carried this letter to Roy Stepaniak, an assistant business representative of the union. At Stepaniak's suggestion he completed a written grievance report. Stepaniak mailed the grievance report and the Shannon letter to Larry Belger of the Belger Cartage Service, asking Belger to contact him (Stepaniak) after he had a chance "to review the situation". This letter was dated August 27.

A week later plaintiff went to the union hall to inquire about the progress of his case. Stepaniak had not been able to "set up a meeting" with Belger, but expressed confidence in the merits of the grievance and indicated it would be pursued. He suggested to plaintiff that he secure another letter from court officials. Osborne went to the courthouse again. This time he secured a letter from Presiding Judge Miller, directed to Larry Belger, with carbon copy to plaintiff. The letter said that Mr. Osborne should have reported to work on the days he was on standby duty, but would have been "subject to call". The letter continued:

> My information is that this was not explained properly to the jurors by the jury clerk, and that as a result, several jurors were misled into believing that they were to remain at home, subject to call... (W)e trust that this misunderstanding due to our fault will not be held against Mr. Osborne.

Almost a month passed, during which Osborne made several unsuccessful attempts to find out from the union local offices what progress, if any, was being made on his grievance. After a month, Stepaniak returned one of his calls and told him that the union had decided to "drop the case"—that they "felt like they couldn't win it".

The union officials testified to their exertions on plaintiff's behalf:

A meeting for September 28 was arranged with representatives of the union

and representatives of the employer to take up the grievance. The reason the meeting was postponed so long (after the discharge of August 23, and the initial letter from Stepaniak to Belger August 27), according to Stepaniak's deposition testimony, was "the company asking for time to complete their records. They was in contact with the courts getting information pertaining to the case, and I think it took some time for that."

Present at the September 28 grievance meeting were Mr. Belger and Mr. Mosiman, who was director of safety and personnel for the company. Representing the union were Mr. Stepaniak and John Green, another assistant business representative of the union. Presumably at this meeting Mr. Mosiman presented a "Memo to File" of a telephone conversation which he had had with court administrator Richard B. Shannon about the Prentice Osborne matter on September 1. The memorandum stated:

> Mr. Shannon stated he normally gave instructions to the jurors but in his absence it had apparently been handled by a "Stella". Mr. Shannon further stated that the court did not like to see a juror lose his job as a result of serving as a juror but since it was possible there had been a misunderstanding of the instructions by Mr. Osborne, he had written the letter of August 24. He stated further that if Mr. Osborne did not understand the instructions, he was the only one of 75 others who did misunderstand. It was apparent during the conversation that Mr. Shannon was attempting to give Mr. Osborne the benefit of the doubt, and he stated he would tell the Union the same thing.

Within two or three days after the "grievance meeting" Mr. Stepaniak, Mr. Crawford and Mr. Green—and perhaps Mr. Mills, who was president of the union and another business representative—discussed Osborne's grievance at the union offices in the light of their meeting with Belger. They determined at that time not to take the case to arbitration. The arbitration procedure was provided by the contract and would have placed the grievance before an impartial arbiter. Gayle Crawford testified of the reasons for their decision:

> Because, in my judgment and in the judgment of Mr. Stepaniak and Mr. Green, we thought that he had stolen time from the company and he sat home on the 11th, 12th, and 13th, and did not contact the company at any time, except until Friday at noon, to tell them he had been released from jury duty, or that he was on standby, or whatever reflection he had done, he had not contacted the company anytime until Friday noon to tell them about it. He had a right to go to work on the 11th, 12th and 13th, and at that time we considered that he had stole the time of the 11th, 12th and 13th, that the company was paying him for.

Also entering into the decision was Crawford's expert knowledge of jury practices, based upon his experience in serving on two jury panels in Jackson County, Missouri.

Stepaniak stated that he was highly suspicious of Mr. Osborne bona fides "because he didn't want to file a grievance, to start with... I didn't know what his reason was. He didn't explain to me. He didn't tell me." (Osborne testified on the trial that the reason he did not want to file a grievance was that he wanted to invoke the "discharge review" procedure provided by the contract, rather than the grievance procedure. The discharge review was required to be taken up within 48 hours.) Stepaniak testified that they concluded that Mr. Shannon and Judge Miller were "covering up" for Osborne, and that Osborne had known he should have gone to work.

■ There is here an abundance of evidence from which the jury could find that the union's representation of Mr. Osborne was arbitrary and perfunctory, and that it fell far short of what it owed Osborne in the way of fair representation.

■ It is to be kept in mind that Osborne had surrendered his right to represent himself by his union membership and under

the contract the union had with the employer. This relationship among union member, union and employer is the basis for the requirement of fair representation of the worker by the union. *Vaca v. Sipes*, supra 386 U.S. at 177, 87 S.Ct. at 910; *Baldwin v. Local 843, Intern. Broth. of Teamsters*, 562 F.Supp. 36, 40 (D.N.J.1982).

Here there was evidence from which it could be believed that Prentice Osborne's cause was really never at any point presented in any positive way. Osborne himself at the time of his discharge was cut off first by Larry Belger and then by personnel director Mosiman from making any explanation of his absence from work while on standby jury duty. His explanation to his union representatives was discounted by them, even though supported by written statements from the Wyandotte County District Court administrator, Mr. Shannon, and from Presiding Judge Miller. Over against Osborne's explanation and the corroborative statements of Mr. Shannon and of Judge Miller, the union representatives placed Mr. Crawford's experience in serving on Jackson County, Missouri, juries, and concluded that Osborne was dishonest in his claim, and that Shannon and Judge Miller were "covering up" for him. The union representatives arrogated to themselves the decision upon the merits without consulting attorneys and without taking up the matter with the union's executive board or executive committee, a course that was open to them. Their meeting with Belger and Mosiman was apparently perfunctory. They seem to have accepted uncritically Mosiman's "Memo to File" which cast doubt upon Court Administrator Shannon's letter "To Whom it may Concern". While Stepaniak testified he asked Belger at this meeting to reinstate Osborne, the others present at the meeting were unable to remember that any such request had been made. The meeting itself was delayed more than 30 days after the grievance was filed. The union made no effort at all to expedite the procedure. Osborne was not present at the meeting, evidently uninvited.

The union representatives never contacted Judge Miller. They never attempted to contact "Stella", the person who had actually instructed the jury panel members during the time Mr. Osborne was serving. Mr. Crawford made one unsuccessful attempt to contact Mr. Shannon by telephone.

At this point the case was abandoned. It was never heard by a disinterested arbitrator to whom Osborne's case might have been presented. Mr. Stepaniak concluded that they had a less than 50 percent chance of winning on arbitration.

We conclude that plaintiff made a submissible case, and that contention by appellants is rejected.

2. *Damage instruction.*

The union complains of the damage instruction. It reads as follows:

If you find the issues in favor of the plaintiff, then you must determine such sum as you believe will fairly and justly compensate the plaintiff for any damages you believe he sustained as a direct result of the defendant's conduct as mentioned in the evidence.

After you have determined such sum, you must adjust all sums received by plaintiff, from any source, from the date of his discharge through April 5, 1980.

The instruction is patterned after MAI 4.01. with the second paragraph added.[1]

The union criticizes this instruction on two grounds. The first ground of criticism is that the instruction fails to advise the jury that they must apportion the plaintiff's damages (in the form of back wages) between the union and the employer. Under this head, the union calls upon the rule of *Vaca v. Sipes*, supra, and *Bowen v. U.S. Postal Service*, supra, which does indeed

---

1. The reason for the second paragraph was the plaintiff had earned some money at various temporary jobs after his discharge and until he began permanent employment with the United States Postal Service on April 5, 1980. The union makes no complaint about the addition of the second paragraph.

require an apportionment of back-pay damages between the employer and union in the case of a wrongful discharge by the employer, and a breach by the union of its duty of fair representation.[2]

■ However, this instruction is not to be condemned because it does not advise the jury of that fact. The instruction correctly says that the jury is to award to the plaintiff against *the union* such damages as he sustained as the direct result of *its, the union's* conduct.

The instruction complies in letter and in philosophy with MAI 4.01. Such matters as the union says should have been included in the instruction, namely, the apportionment between union and employer, are matters left to jury argument—and in case the parties are in disagreement on the proper measure of damages, that is a matter which is to be ruled upon by the court during argument, or, much to be preferred, in the instruction conference before argument. *Crawford v. Smith*, 470 S.W.2d 529, 533–34 (Mo.banc 1971); *Morgan v. Wartenbee*, 569 S.W.2d 391, 395 (Mo.App.1978). The union did not request any ruling by the court with respect to jury arguments on damages.

■ We note further that the union offered no cautionary instruction containing any direction to the jury that the back-pay damages should be apportioned between employer and union, or how they should be so apportioned. For that reason they may be held to have waived the point. *Strauss v. Hotel Continental Co., Inc.*, 610 S.W.2d 109, 112 (Mo.App.1980).

The union makes a second complaint about the instruction. That is that the jury was not instructed that back-pay damages could not be awarded beyond November, 1976. The same argument is made in connection with a claim of error in the court's refusal of an instruction offered by the union which did so limit back-pay damages.

The date of November, 1976, is the date at which Osborne testified that he abandoned any attempt to recover his job at Belger.

■ We will assume for the purpose of this argument that the employer would not have been liable for back pay beyond that point. (Appellant cites for that proposition Top Manufacturing Co., Inc., 254 N.L.R.B. No. 124 (1981); Trinity Valley Iron & Steel Co., 158 N.L.R.B. No. 80 (1966); Argo Steel Construction Co., 122 N.L.R.B. No. 129 (1959); Alexander Manufacturing Co., 110 N.L.R.B. No. 210 (1954)). It does not follow that plaintiff's damages flowing from the union's failure fairly to represent him are similarly limited. In the present case, the reason the plaintiff abandoned any hope or expectation of returning to Belger's employment was that the union representatives had accepted Belger's decision to discharge him and had declined to take Osborne's complaint to arbitration. Defendant union cites no authority nor does it advance any plausible reason why there should be such an arbitrary cutoff of lost wages damages at that time.

Judgment affirmed.

All concur.

---

2. As a general thing both the employer and the union are defendants in these cases, as was true in *Bowen*, supra, but here, as in *Vaca*, supra, the union is the sole defendant. See Gregory, Union Liability for Damages after *Bowen v. Postal Service:* The Incongruity between Labor Law and Title VII Jurisprudence, 35 Baylor L.Rev. 237 (1983).