# BOWEN *v.* UNITED STATES POSTAL SERVICE ET AL.

No. 81–525.   Argued October 6, 1982—Decided January 11, 1983

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEVENS, and O'CONNOR, JJ., joined. WHITE, J., filed an opinion concurring in the judgment in part and dissenting in part, in which MARSHALL and BLACKMUN, JJ., joined, and in all but Part IV of which REHNQUIST, J., joined, post, p. 230. REHNQUIST, J., filed a dissenting opinion, post, p. 246.

*William B. Poff* argued the cause for petitioner. With him on the briefs were *Baynard E. Harris* and *John D. Eure.*

*Barbara E. Etkind* argued the cause for the federal respondent. With her on the briefs were *Solicitor General Lee, Assistant Attorney General McGrath, Deputy Solicitor General Geller, Leonard Schaitman, Michael Jay Singer,* and *Stephen E. Alpern.* *Asher W. Schwartz* argued the cause for respondent Union. With him on the brief were

*Darryl J. Anderson, Anton G. Hajjar, Laurence Gold,* and *Marsha Berzon.*\*

JUSTICE POWELL delivered the opinion of the Court.

The issue is whether a union may be held primarily liable for that part of a wrongfully discharged employee's damages caused by his union's breach of its duty of fair representation.

I

On February 21, 1976, following an altercation with another employee, petitioner Charles V. Bowen was suspended without pay from his position with the United States Postal Service. Bowen was a member of the American Postal Workers Union, AFL–CIO, the recognized collective-bargaining agent for Service employees. After Bowen was formally terminated on March 30, 1976, he filed a grievance with the Union as provided by the collective-bargaining agreement. When the Union declined to take his grievance to arbitration, he sued the Service and the Union in the United States District Court for the Western District of Virginia, seeking damages and injunctive relief.

Bowen's complaint charged that the Service had violated the collective-bargaining agreement by dismissing him without "just cause" and that the Union had breached its duty of fair representation. His evidence at trial indicated that the responsible Union officer, at each step of the grievance process, had recommended pursuing the grievance but that the national office, for no apparent reason, had refused to take the matter to arbitration.

Following the parties' presentation of evidence, the court gave the jury a series of questions to be answered as a special verdict.[1] If the jury found that the Service had discharged

---

\**Eugene B. Granof* and *Stephen A. Bokat* filed a brief for the Chamber of Commerce of the United States as *amicus curiae* urging reversal.

[1] The jury sat only as an advisory panel on Bowen's claims against the Service. See 28 U. S. C. § 2402 ("Any action against the United States under section 1346 shall be tried by the court without a jury").

Bowen wrongfully and that the Union had breached its duty of fair representation, it was instructed to determine the amount of compensatory damages to be awarded and to apportion the liability for the damages between the Service and the Union.[2] In explaining how liability might be apportioned, the court instructed the jury that the issue was left primarily to its discretion. The court indicated, however, that the jury equitably could base apportionment on the date of a hypothetical arbitration decision—the date at which the Service would have reinstated Bowen if the Union had fulfilled its duty. The court suggested that the Service could be liable for damages before that date and the Union for damages thereafter. Although the Union objected to the instruction allowing the jury to find it liable for any compensatory damages, it did not object to the manner in which the court instructed the jury to apportion the damages in the event apportionment was proper.[3]

Upon return of a special verdict in favor of Bowen and against both defendants, the District Court entered judg-

---

[2] Question 3 of the special verdict stated: "If [you find that the Union breached its duty of fair representation and/or the Service discharged Bowen without just cause], state from a preponderance of the evidence or with reasonable certainty the amount of compensatory damages to which [Bowen] is entitled." App. to Pet. for Cert. A21–A22.

Question 8 stated: "If compensatory damages are awarded by your answer to Question 3, state the amount, if any, that should be attributable to the defendant Union and the amount, if any, that should be attributable to the defendant Postal Service." *Id.*, at A22.

[3] Counsel for the Union stated: "Your Honor, in respect to this special verdict form, the [Union] would object to any verdict or any question here which would allow the jury to return a judgement against the [Union] for any form . . . of wages. Traditionally, the Union does not pay wages. And these damages are wholly assessable to the [Service], if at all." 3 Record 611–612.

In a motion for judgment notwithstanding the verdict, counsel for the Union reasserted that the "amount of back wages awarded [Bowen] by the jury against the [Union] is as a matter of law wholly assess[a]ble against the employer." 1 Record, Item 37, ¶ 2.

ment, holding that the Service had discharged Bowen without just cause and that the Union had handled his "apparently meritorious grievance . . . in an arbitrary and perfunctory manner . . . ." 470 F. Supp. 1127, 1129 (1979). In so doing, both the Union and the Service acted "in reckless and callous disregard of [Bowen's] rights."[4] *Ibid.* The court found that Bowen could not have proceeded independently of the Union[5] and that if the Union had arbitrated Bowen's grievance, he would have been reinstated. *Ibid.*

The court ordered that Bowen be reimbursed $52,954 for lost benefits and wages. Although noting that "there is authority suggesting that only the employer is liable for dam-

---

[4] The District Court had instructed the jury that both the Union and the Service could be liable for punitive damages if either had acted "maliciously or recklessly or in callous disregard of the rights of the Plaintiff [Bowen]." 3 Record 597. The jury found that the Service and the Union were liable for punitive damages of $30,000 and $10,000, respectively. App. to Pet. for Cert. A22. The District Court determined, however, that punitive damages could not be assessed against the Service because of sovereign immunity. 470 F. Supp., at 1131. Although the court found that the Union's actions supported the jury's award of punitive damages, it set the award aside. It concluded that it would be unfair to hold the Union liable when the Service was immune. *Ibid.* Bowen did not appeal the District Court's decision on this point.

[5] The grievance-arbitration clause contained in the contract between the Service and the Union provides for a four-step grievance procedure. The employee may initiate the grievance by discussing it with his supervisor. The Union has discretion to appeal on the employee's behalf and can elect to pursue the grievance through the next three steps. If the grievance is not settled, the Union may refer the grievance to arbitration. See 1 Record, Item 25, Exhibit 1.

Although Bowen could have appealed his discharge to the Civil Service Commission, his right to do so expired 15 days after notice of the Service's action. Moreover, by choosing to pursue his administrative remedies, Bowen would have "waive[d] access to any procedures under the National Agreement beyond Step 2B of the Grievance-Arbitration Procedures." App. 90–91. By choosing the remedy provided by the grievance procedure, he was prevented from presenting his claim to the Civil Service Commission.

ages in the form of backpay," it observed that "this is a case in which both defendants, by their illegal acts, are liable to plaintiff. . . . The problem in this case is not one of liability but rather one of apportionment . . . ." *Id.*, at 1130–1131. The jury had found that the Union was responsible for $30,000 of Bowen's damages. The court approved that apportionment, ordering the Service to pay the remaining $22,954.[6]

On appeal by the Service and the Union, the Court of Appeals for the Fourth Circuit overturned the damages award against the Union. 642 F. 2d 79 (1981). It accepted the District Court's findings of fact, but held as a matter of law that, "[a]s Bowen's compensation was at all times payable only by the Service, reimbursement of his lost earnings continued to be the obligation of the Service exclusively. Hence, no portion of the deprivations . . . was chargeable to the Union. Cf. *Vaca* v. *Sipes*, 386 U. S. 171, 195 . . . (1967)." *Id.*, at 82 (footnote omitted). The court did not alter the District Court's judgment in any other respect, but "affirmed [it] throughout" except for the award of damages against the Union. *Id.*, at 83.

Thus, the Court of Appeals affirmed the District Court's apportionment of fault and its finding that both the Union and the Service had acted "in reckless and callous disregard of [Bowen's] rights."[7] Indeed, the court accepted the Dis-

---

[6] The District Court found as a fact that if Bowen's grievance had been arbitrated he would have been reinstated by August 1977. Lost wages after that date were deemed the fault of the Union: "While the [Service] set this case in motion with its discharge, the [Union's] acts, upon which [Bowen] reasonably relied, delayed the reinstatement of [Bowen] and it is a proper apportionment to assign fault to the [Union] for approximately two-thirds of the period [Bowen] was unemployed up to the time of trial." 470 F. Supp., at 1131.

[7] In a footnote added after the opinion was first filed, the court noted that it made "no revision in the judgment of $22,954.12 against the Postal Service. In this connection we note that no appeal was entered by

trict Court's apportionment of fault so completely that it refused to increase the $22,954 award against the Service to cover the whole of Bowen's injury. Bowen was left with only a $22,954 award, whereas the jury and the District Court had awarded him lost earnings and benefits of $52,954—the undisputed amount of his damages.

## II

In *Vaca* v. *Sipes*, 386 U. S. 171 (1967), the Court held that an employee such as Bowen, who proves that his employer violated the labor agreement and his union breached its duty of fair representation, may be entitled to recover damages from both the union and the employer. The Court explained that the award must be apportioned according to fault:

> "The governing principle, then, is to apportion liability between the employer and the union according to the damage caused by the fault of each. Thus, damages attributable solely to the employer's breach of contract should not be charged to the union, but increases if any in those damages caused by the union's refusal to process the grievance should not be charged to the employer." *Id.*, at 197–198.

Although *Vaca*'s governing principle is well established, its application has caused some uncertainty.[8] The Union ar-

---

[Bowen] from the judgment against the Service in the amount of $22,954.12." 642 F. 2d, at 82, n. 6.

The court's view that the judgment against the Service could not be increased because of Bowen's failure to appeal is erroneous. Bowen won an unambiguous victory in the District Court. He established that he had been discharged by the employer without just cause and that the Union had breached its duty of fair representation. The amount of lost wages and benefits was not in dispute, and the jury and the District Court awarded him all of his damages, apportioning them between the Union and the Service. Bowen had no reason to be unhappy with the award and should not have been deprived of the full amount of his compensatory damages because of his failure to cross-appeal.

[8] JUSTICE WHITE's dissent asserts that the "rationale" of apportioning damages, applied by the Court today, "has been rejected by every Court of

gues that the Court of Appeals correctly determined that it cannot be charged with any damages resulting from a wrongful discharge. *Vaca*'s "governing principle," according to

Appeals that has squarely considered it." See *post*, at 231, and n. 1. Apart from the fact that we apply the rationale—the "governing principle"—articulated in *Vaca*, few Courts of Appeals have stated a rationale nor has there been the consistency in result perceived by the dissent. Only one case cited by the dissent has declined to apportion damages after considering the issue fully. See *Seymour* v. *Olin Corp.*, 666 F. 2d 202 (CA5 1982). Others, such as the opinion below, have rejected apportionment after giving the issue only minimal consideration. See 642 F. 2d 79, 82 (CA4 1981) (simply citing *Vaca*, but not *Vaca*'s governing principle); *Milstead* v. *International Brotherhood of Teamsters, Local Union 957*, 649 F. 2d 395, 396 (CA6 1981) (finding that damages may not be apportioned on the basis of *St. Clair* v. *Local 515*, 422 F. 2d 128 (CA6 1969), which found that damages may be apportioned). Some courts have not apportioned damages, but have articulated apparently conflicting rationales. See *Wyatt* v. *Interstate & Ocean Transport Co.*, 623 F. 2d 888, 892–893 (CA4 1980) (refusing to hold union liable for portion of damages caused by its breach but stating that damages can be apportioned when the union "exacerbate[s the employee's] loss or diminution of wages, beyond that for which the employer could be charged"); *De Arroyo* v. *Sindicato de Trabajadores Packinghouse*, 425 F. 2d 281, 289–290 (CA1) (refusing to hold union liable for portion of damages caused by its default but stating that apportionment would be proper where there was evidence "that but for the Union's conduct the plaintiffs would have been reinstated or reimbursed at an earlier date"), cert. denied, 400 U. S. 877 (1970). While it is true these cases reach the same result as the dissent, they do not represent an affirmation of its reasoning.

Other cases have recognized that damages should be apportioned between the union and the employer. See *Smart* v. *Ellis Trucking Co.*, 580 F. 2d 215, 219, n. 6 (CA6 1978) (on remand, trial court to determine "the extent to which the employer's liability for any backpay may be limited" because of its reliance on arbitration proceeding); *Harrison* v. *Chrysler Corp.*, 558 F. 2d 1273, 1279 (CA7 1977) ("union which breaches its duty of fair representation may be sued by an employee for lost pay attributable to the breach"); *Ruzicka* v. *General Motors Corp.*, 523 F. 2d 306, 312 (CA6 1975) ("Union . . . liable for that portion of Appellant's injury representing 'increases if any in those damages [chargeable to the employer] caused by the union's refusal to process the grievance'") (brackets in Court of Appeals opinion); *St. Clair* v. *Local 515, supra*, at 132 (holding union "liable for nothing more [than damages measured by backpay] and perhaps for

the Union, requires that the employer be solely liable for such damages. The Union views itself as liable only for Bowen's litigation expenses resulting from its breach of duty. It finds support for this view in *Vaca*'s recognition that a union's breach of its duty of fair representation does not absolve an employer of all the consequences of a breach of the collective-bargaining contract. See *id.*, at 196. The Union contends that its unrelated breach of the duty of fair representation does not make it liable for any part of the discharged employee's damages; its default merely lifts the bar to the employee's suit on the contract against his employer.

The difficulty with this argument is that it treats the relationship between the employer and employee, created by the collective-bargaining agreement, as if it were a simple contract of hire governed by traditional common-law principles. This reading of *Vaca* fails to recognize that a collective-bargaining agreement is much more than traditional common-law employment terminable at will. Rather, it is an agreement creating relationships and interests under the federal common law of labor policy.

## A

In *Vaca*, as here, the employee contended that his employer had discharged him in violation of the collective-bargaining agreement and that the union had breached its duty of fair representation by refusing to take his claim to arbitration. He sued the union in a Missouri state court for breach of its duty. On finding that both the union and the employer

less" because *Vaca* requires those damages to be apportioned between the employer and union according to each party's fault). See also Feller, A General Theory of the Collective Bargaining Agreement, 61 Calif. L. Rev. 663, 817–824 (1973) (employer's liability should not be increased by union's default); Comment, Apportionment of Damages in DFR/Contract Suits: Who Pays for the Union's Breach, 1981 Wis. L. Rev. 155 (same). In sum, a fair reading of these cases reveals that, contrary to the dissent's assertion, the Courts of Appeals have been far from unanimous in either their results or their rationales.

were at fault, the jury decided—and the Missouri Supreme Court agreed—that the union was entirely liable for the employee's lost backpay. See *id.*, at 195.

On appeal, this Court was required to resolve a number of issues. One was whether an employee who had failed to exhaust the grievance procedure prescribed in the bargaining agreement could bring suit for a breach of that agreement.[9] In *Republic Steel Corp.* v. *Maddox,* 379 U. S. 650 (1965), the Court had held that "federal labor policy requires that individual employees wishing to assert contract grievances must *attempt* use of the contract grievance procedure agreed upon by employer and union as the mode of redress."[10] *Id.*, at 652 (emphasis in original; footnote omitted). Because the employee in *Republic Steel* had made no attempt to exhaust the grievance procedure, it was necessary for the Court to consider only the union's interest in participating in the administration of the contract and the employer's interest in limiting administrative remedies. The Court noted, however, that if "the union refuses to press or only perfunctorily presses the individual's claim," federal labor policy might require a different result. *Ibid.*

*Vaca* presented such a situation. The union, which had the "sole power under the contract to invoke the higher stages of the grievance procedure," had chosen not to take the employee's claim to arbitration. See 386 U. S., at 185. Thus the Court faced a strong countervailing interest: the

---

[9] The Court had previously held in *Smith* v. *Evening News Assn.*, 371 U. S. 195 (1962), that an employee may sue his employer for a breach of the collective-bargaining agreement under § 301 of the Labor Management Relations Act. See 29 U. S. C. § 185. Because the contract in *Smith* did not contain a grievance-arbitration procedure that required exhaustion, *Smith* did not reach the issue presented in *Vaca*. See 371 U. S., at 196, n. 1.

[10] The Court based its decision on Congress' express approval of contract grievance procedures as a preferred method of settling disputes, the union's interest in actively participating in the continuing administration of the contract, and the employer's interest in limiting the choice of remedies available to aggrieved employees. See 379 U. S., at 653.

employee's right to vindicate his claim. *Vaca* resolved these conflicting interests by holding that an employee's failure to exhaust the contractual grievance procedures would bar his suit except when he could show that the union's breach of its duty of fair representation had prevented him from exhausting those remedies. See *ibid.* The *Vaca* Court then observed:

> "It is true that the employer in such a situation may have done nothing to prevent exhaustion of the exclusive contractual remedies to which he agreed in the collective bargaining agreement. But the employer has committed a wrongful discharge in breach of that agreement, a breach which could be remedied through the grievance process to the employee-plaintiff's benefit were it not for the union's breach of its statutory duty of fair representation to the employee. To leave the employee remediless in such circumstances would, in our opinion, be a great injustice." *Id.*, at 185–186.

The interests thus identified in *Vaca* provide a measure of its principle for apportioning damages. Of paramount importance is the right of the employee, who has been injured by both the employer's and the union's breach, to be made whole. In determining the degree to which the employer or the union should bear the employee's damages, the Court held that the employer should not be shielded from the "natural consequences" of its breach by wrongful union conduct. *Id.*, at 186. The Court noted, however, that the employer may have done nothing to prevent exhaustion. Were it not for the union's failure to represent the employee fairly, the employer's breach "could [have been] remedied through the grievance process to the employee-plaintiff's benefit." The fault that justifies dropping the bar to the employee's suit for damages also requires the union to bear some responsibility for increases in the employee's damages resulting from its breach. To hold otherwise would make the employer alone liable for the consequences of the union's breach of duty.

*Hines* v. *Anchor Motor Freight, Inc.*, 424 U. S. 554 (1976), presented an issue analogous to that in *Vaca:* whether proof of a breach of the duty of fair representation would remove the bar of finality from an arbitral decision.   We held that it would, in part because a contrary rule would prevent the employee from recovering

> "even in circumstances where it is shown that a union has manufactured the evidence and knows from the start that it is false; or even if, unbeknownst to the employer, the union has corrupted the arbitrator to the detriment of disfavored union members."   424 U. S., at 570.

It would indeed be unjust to prevent the employee from recovering in such a situation.   It would be equally unjust to require the employer to bear the increase in the damages caused by the union's wrongful conduct.[11]   It is true that the employer discharged the employee wrongfully and remains liable for the employee's backpay.   See *Vaca*, 386 U. S., at 197.   The union's breach of its duty of fair representation, however, caused the grievance procedure to malfunction resulting in an increase in the employee's damages.   Even though both the employer and the union have caused the damage suffered by the employee, the union is responsible for the increase in damages and, as between the two wrongdoers, should bear its portion of the damages.[12]

*Vaca*'s governing principle reflects this allocation of responsibility.   As the Court stated, "damages attributable *solely* to the employer's breach of contract should not be charged to the union, but *increases* if any in those damages

---

[11] We note that this is not a situation in which either the union or the employer has participated in the other's breach.   See *Vaca*, 386 U. S., at 197, n. 18.

[12] Although the union remains primarily responsible for the portion of the damages resulting from its default, *Vaca* made clear that the union's breach does not absolve the employer of liability.   Thus if the petitioner in this case does not collect the damages apportioned against the Union, the Service remains secondarily liable for the full loss of backpay.

caused by the union's refusal to process the grievance should not be charged to the employer." *Id.*, at 197–198 (emphasis added). The Union's position here would require us to read out of the *Vaca* articulation of the relevant principle the words emphasized above.[13] It would also ignore the interests of all the parties to the collective agreement—interests that *Vaca* recognized and *Hines* illustrates.

## B

In approving apportionment of damages caused by the employer's breach of the collective-bargaining agreement and the union's breach of its duty of fair representation, *Vaca* did not apply principles of ordinary contract law. For, as the Court has noted, a collective-bargaining agreement "is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." *Steelworkers* v. *Warrior & Gulf Navigation Co.*, 363 U. S. 574, 578 (1960). In defining the relationships created by such an

---

[13] In *Vaca*, the jury had found the union responsible for the entire amount of damages suffered by the employee. The judgment upholding the verdict therefore was reversed. JUSTICE WHITE's dissent reasons that because *Vaca* found that the employer is not absolved from liability by the union's breach, the employer must be solely responsible. The first proposition, however, does not require the second. Thus, *Vaca*'s recognition that the employer "may not hide behind the union's wrongful act" does not answer the question posed by this case, how damages should be apportioned as between the two wrongdoers, the union and the employer. On this point, the explicit language of *Vaca*'s governing principle makes clear that the union is responsible for increases in the employee's damages flowing from the wrongful discharge, a point which the dissent glosses over.

Although the Court in *Vaca* concluded that the union had not breached its duty, it observed that "[i]n this case, even if the Union had breached its duty, all or almost all of [the employee's] damages would still be attributable to his allegedly wrongful discharge." *Id.*, at 198. Assuming that such a breach did occur, the facts are not sufficiently clear to determine when the breach would have occurred or the portion of damages attributable to each party's fault. Thus this speculative observation is not inconsistent with the Court's precisely worded statement of the governing principle.

agreement, the Court has applied an evolving federal common law grounded in national labor policy. See *Steelworkers* v. *American Manufacturing Co.*, 363 U. S. 564, 567 (1960); *Textile Workers* v. *Lincoln Mills*, 353 U. S. 448, 456–457 (1957).

Fundamental to federal labor policy is the grievance procedure. See *John Wiley & Sons, Inc.* v. *Livingston,* 376 U. S. 543, 549 (1964); *Warrior & Gulf Navigation Co., supra*, at 578. It promotes the goal of industrial peace by providing a means for labor and management to settle disputes through negotiation rather than industrial strife. See *John Wiley & Sons, Inc., supra*, at 549. Adoption of a grievance procedure provides the parties with a means of giving content to the collective-bargaining agreement and determining their rights and obligations under it. See *Warrior & Gulf Navigation Co., supra*, at 581.

Although each party participates in the grievance procedure, the union plays a pivotal role in the process since it assumes the responsibility of determining whether to press an employee's claims.[14] The employer, for its part, must rely on the union's decision not to pursue an employee's grievance. For the union acts as the employee's exclusive representative in the grievance procedure, as it does in virtually all matters

---

[14] The parties to the collective-bargaining agreement, of course, may choose not to include a grievance procedure supervised by the union or, if they do, may choose not to make the procedure exclusive. See *Vaca, supra*, at 184, n. 9; *Republic Steel Corp.* v. *Maddox*, 379 U. S. 650, 657–658 (1965); cf. 29 U. S. C. § 159(a) (employee may present grievances to his employer "without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect . . ."). Most collective-bargaining agreements, however, contain exclusive grievance-arbitration procedures and give the union power to supervise the procedure. See Feller, *supra* n. 8, at 742, 752–753. When the collective-bargaining agreement provides the union with sole authority to press an employee's grievance, the union acts as the employee's exclusive representative in the grievance-arbitration procedure. See *Vaca, supra*, at 191–192.

involving the terms and conditions of employment. Just as a nonorganized employer may accept an employee's waiver of any challenge to his discharge as a final resolution of the matter, so should an organized employer be able to rely on a comparable waiver by the employee's exclusive representative.

There is no unfairness to the union in this approach. By seeking and acquiring the exclusive right and power to speak for a group of employees, the union assumes a corresponding duty to discharge that responsibility faithfully—a duty which it owes to the employees whom it represents and on which the employer with whom it bargains may rely. When the union, as the exclusive agent of the employee, waives arbitration or fails to seek review of an adverse decision, the employer should be in substantially the same position as if the employee had had the right to act on his own behalf and had done so. Indeed, if the employer could not rely on the union's decision, the grievance procedure would not provide the "uniform and exclusive method for [the] orderly settlement of employee grievances," which the Court has recognized is essential to the national labor policy.[15] See *Clayton* v. *Automobile Workers*, 451 U. S. 679, 686–687 (1981).

---

[15] Under the analysis of JUSTICE WHITE's dissent, the employer may not rely on the union's decision not to pursue a grievance. Rather it can prevent continued liability only by reinstating the discharged employee. See *post*, at 238–239. This leaves the employer with a dubious option: it must either reinstate the employee promptly or leave itself exposed to open-ended liability. If this were the rule, the very purpose of the grievance procedure would be defeated. It is precisely to provide the exclusive means of resolving this kind of dispute that the parties agree to such a procedure and national labor policy strongly encourages its use. See *Republic Steel*, *supra*, at 653.

When the union has breached its duty of fair representation, the dissent justifies its rule by arguing that "only the employer ha[s] the continuing ability to right the wrong . . . by reinstating" the employee, an ability that the union lacks. See *post*, at 239. But an employer has no way of knowing that a failure to carry a grievance to arbitration constitutes a breach of duty. Rather than rehiring, as the dissent suggests, the employer reasonably could assume that the union had concluded the discharge was justi-

The principle announced in *Vaca* reflects this allocation of responsibilities in the grievance procedure—a procedure that contemplates that both employer and union will perform their respective obligations. In the absence of damages apportionment where the default of both parties contributes to the employee's injury, incentives to comply with the grievance procedure will be diminished. Indeed, imposing total liability solely on the employer could well affect the willingness of employers to agree to arbitration clauses as they are customarily written.

Nor will requiring the union to pay damages impose a burden on the union inconsistent with national labor policy.[16] It will provide an additional incentive for the union to process its members' claims where warranted. See *Vaca*, 386 U. S., at 187. This is wholly consistent with a union's interest. It is a duty owed to its members as well as consistent with the

---

fied. The union would have the option, if it realized it had committed an arguable breach of duty, to bring its default to the employer's attention. Our holding today would not prevent a jury from taking such action into account. See n. 19, *infra*.

Moreover, the rule urged by the dissenting opinion would allow the union and the employee, once the case goes to trial, to agree to a settlement pursuant to which the union would acknowledge a breach of its duty of fair representation in exchange for the employee's undertaking to look to his employer for his entire recovery. Although we may assume that this would not occur frequently, the incentive the dissent's rule would provide to agree to such a settlement demonstrates its unsoundness.

[16] Requiring the union to pay its share of the damages is consistent with the interests recognized in *Electrical Workers* v. *Foust*, 442 U. S. 42 (1979). In *Foust*, we found that a union was not liable for punitive damages. The interest in deterring future breaches by the union was outweighed by the debilitating impact that "unpredictable and potentially substantial" awards of punitive damages would have on the union treasury and the union's exercise of discretion in deciding what claims to pursue. *Id.*, at 50–52. An award of compensatory damages, however, normally will be limited and finite. Moreover, the union's exercise of discretion is shielded by the standard necessary to prove a breach of the duty of fair representation. Thus, the threat that was present in *Foust* is absent here.

union's commitment to the employer under the arbitration clause. See *Republic Steel*, 379 U. S., at 653.

## III

The Union contends that *Czosek* v. *O'Mara*, 397 U. S. 25 (1970), requires a different reading of *Vaca* and a different weighing of the interests our cases have developed. *Czosek*, however, is consistent with our holding today.[17] In *Czosek*, employees of the Erie Lackawanna Railroad were placed on furlough and not recalled. They brought suit against the railroad for wrongful discharge and against their union for breaching its duty of fair representation. They alleged that the union had arbitrarily and capriciously refused to process their claims against the railroad. See 397 U. S., at 26. The District Court dismissed the claim against the railroad because the employees had not pursued the administrative rem-

---

[17] In cases following *Vaca* and *Czosek*, the Court has not had occasion to address the question presented here. In *Hines* v. *Anchor Motor Freight, Inc.*, 424 U. S. 554 (1976), we held that proof of a breach of the duty of fair representation will remove the bar of finality from arbitral decisions. We did not consider the scope of the remedy available, but stated that if the employer had wrongfully discharged the employee and the union had breached its duty, the employee was "entitled to an appropriate remedy against the employer as well as the Union." *Id.*, at 572. In *Foust*, we reviewed the principles announced in *Vaca* as bearing on the question of whether a union can be held liable for punitive damages. Although *Foust*'s discussion of *Vaca* could be read as suggesting a contrary principle to that stated in *Vaca*, the holding in *Foust*—that a union may not be held liable for punitive damages—is consistent with our holding here. Finally, in *Clayton* v. *Automobile Workers*, 451 U. S. 679, 690, n. 15 (1981), the Court reiterated *Vaca*'s governing principle. Although the Court did not apply that principle, the context in which it was discussed bears on the question presented here. In considering whether the remedies available to the employee in an internal union procedure were equivalent to the remedies available to an employee in a § 301 suit, the Court found it significant that the union procedures allowed an employee to recover backpay against the union. This was a recognition of *Vaca*'s explicitly announced governing principle.

edies provided by the Railway Labor Act.[18]   It dismissed the claim against the union because the employees' ability to pursue an administrative remedy on their own absolved the union of any duty.   The Court of Appeals for the Second Circuit affirmed the dismissal of the claim against the railroad but found that the employees had stated a claim against the union.   Even though the employees had a right to seek full redress from an administrative board, the union still had a duty to represent them fairly.   See *Conley* v. *Gibson*, 355 U. S. 41 (1957).

This Court affirmed.   In so doing, it addressed the union's concern that if the railroad were not joined as a party, the union might be held responsible for damages for which the railroad was wholly or partly responsible.   The Court stated:

> "[J]udgment against [the union] can in any event be had only for those damages that flowed from [its] own conduct.   Assuming a wrongful discharge by the employer independent of any discriminatory conduct by the union and a subsequent discriminatory refusal by the union to process grievances based on the discharge, damages against the union for loss of employment are unrecoverable except to the extent that its refusal to handle the grievances added to the difficulty and expense of collecting from the employer."   397 U. S., at 29 (footnote omitted).

Although the statement is broadly phrased, it should not be divorced from the context in which it arose.   The Railway Labor Act provided the employees in *Czosek* with an alternative remedy, which they could have pursued when the union refused to process their grievances.   Because the union's actions did not deprive the employees of immediate access to a

---

[18] See 45 U. S. C. §§ 153 First (i), (j).   These sections provide that an employee who is unsuccessful at the grievance level can seek relief on his own from the National Railroad Adjustment Board.   The Board is authorized to provide remedies similar to those available in a court suit.   See *Republic Steel*, 379 U. S., at 657, n. 14.

remedy, it did not increase the damages that the employer otherwise would have had to pay. The Court therefore stated that the only damages flowing from the union's conduct were the added expenses the employees incurred. This is consistent with *Vaca*'s recognition that each party should bear the damages attributable to its fault.

## IV

In this case, the findings of the District Court, accepted by the Court of Appeals, establish that the damages sustained by petitioner were caused initially by the Service's unlawful discharge and increased by the Union's breach of its duty of fair representation. Accordingly, apportionment of the damages was required by *Vaca*.[19] We reverse the judgment of the Court of Appeals and remand for entry of judgment allocating damages against both the Service and the Union consistent with this opinion.

*It is so ordered.*

JUSTICE WHITE, with whom JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE REHNQUIST (except as to Part IV) join, concurring in the judgment in part and dissenting in part.

The Court holds that an employer who wrongfully discharges an employee protected by a collective-bargaining agreement with an arbitration clause is only responsible for backpay that accrues prior to the hypothetical date upon which an arbitrator would have issued an award had the employee's union taken the matter to arbitration. All backpay damages that accrue after this time are the sole responsibil-

---

[19] We need not decide whether the District Court's instructions on apportionment of damages were proper. The Union objected to the instructions only on the ground that no back wages at all could be assessed against it. It did not object to the manner of apportionment if such damages were to be assessed. Nor is it necessary in this case to consider whether there were degrees of fault, as both the Service and the Union were found to have acted in "reckless and callous disregard of [Bowen's] rights."

ity of the union, even where, as here, the union is in no way responsible for the employer's decision to terminate the employee. This rationale, which heretofore has been rejected by every Court of Appeals that has squarely considered it,[1] does not give due regard to our prior precedents, to equitable principles, or to the national labor policy. I therefore re-

---

[1] In addition to the opinion below in the present case, 642 F. 2d 79 (CA4 1981), see *Seymour* v. *Olin Corp.*, 666 F. 2d 202 (CA5 1982), and *Milstead* v. *International Brotherhood of Teamsters, Local Union 957*, 649 F. 2d 395 (CA6), cert. denied, 454 U. S. 896 (1981). These three are the only Court of Appeals decisions rendering square holdings on the issue. However, also consistent with the view advanced in this dissent are *Wyatt* v. *Interstate & Ocean Transport Co.*, 623 F. 2d 888 (CA4 1980) (assessing the employer for all backpay), and *Soto Segarra* v. *Sea-Land Service, Inc.*, 581 F. 2d 291, 298 (1978), where the First Circuit specifically noted that, in accordance with *Vaca* v. *Sipes*, 386 U. S. 171 (1967), and *Czosek* v. *O'Mara*, 397 U. S. 25 (1970), the District Court "did not charge the union for any of the back pay due appellee but instead awarded $5,750 in attorney's fees proximately caused by the Union's failure to process his grievance." See also *De Arroyo* v. *Sindicato de Trabajadores Packinghouse*, 425 F. 2d 281, 289–290 (CA1), cert. denied, 400 U. S. 877 (1970), where the employer was held liable for all backpay, even though a jury had found that 40% of this amount accrued because of the union's wrongful conduct. See Feller, A General Theory of the Collective Bargaining Agreement, 61 Calif. L. Rev. 663, 671–672 (1973).

The Court incorrectly states, *ante*, at 218–220, n. 8, that the Courts of Appeals have not been consistent on this issue. No Court of Appeals has ever required a union to pay backpay in a case such as this. In fact, the only two cases the Court cites that even suggest the possibility of union liability for backpay are *St. Clair* v. *Local No. 515*, 422 F. 2d 128 (CA6 1969), and *Harrison* v. *Chrysler Corp.*, 558 F. 2d 1273 (CA7 1977). In *St. Clair*, the court did not purport to decide the issue; it stated only that the union certainly would not be liable for anything more than backpay less interim earnings, "and perhaps for less," because, in light of *Vaca*, "the Supreme Court has strongly implied that . . . the increment of damages caused by the union's breach of duty is virtually *de minimis*." 422 F. 2d, at 132. In *Harrison*, the court did make the comment that "a union which breaches its duty of fair representation may be sued by an employee for lost pay attributable to the breach," 558 F. 2d, at 1279, but no union was even a party to the litigation, so this dicta can hardly be regarded as authoritative.

spectfully dissent. For the following reasons, I believe that the employer should be primarily liable for all backpay.

## I

In *Smith* v. *Evening News Assn.*, 371 U. S. 195, 200–201 (1962), we held for the first time that an individual employee may bring a § 301[2] suit against his employer for breach of a collective-bargaining agreement. If, as in *Smith*, the agreement does not contain an arbitration provision, the employee's right to bring suit is unqualified, and, in such a case, the employer unquestionably is liable for any and all backpay that is due.

On the other hand, if, as in the present case, the agreement does contain an arbitration provision, it is much more difficult for an employee to maintain a § 301 action against his employer for any backpay whatsoever. This is because *Republic Steel Corp.* v. *Maddox*, 379 U. S. 650 (1965), established that contractual grievance and arbitration procedures must be exhausted before an employee files a § 301 suit. The *Republic Steel* rule was adopted to protect the integrity of the collective-bargaining process, and to further the national labor policy of encouraging private resolution of disputes arising over the interpretation and implementation of collective-bargaining agreements. See *Clayton* v. *Automobile Workers*, 451 U. S. 679, 686–687 (1981).

Noting that contractual remedies sometimes prove to be "unsatisfactory or unworkable for the individual grievant," we considered in *Vaca* v. *Sipes*, 386 U. S. 171, 185 (1967), the question "under what circumstances the individual employee may obtain judicial review of his breach-of-contract claim de-

---

[2] § 301 of the Labor Management Relations Act, 29 U. S. C. § 185. Because the employer in the present case is the United States Postal Service, petitioner Bowen's action technically arises under § 2 of the Postal Reorganization Act, 39 U. S. C. § 1208(b), which is identical to § 301 in all relevant respects.

spite his failure to secure relief through the contractual remedial procedures." We found that one situation in which "the employee may seek judicial enforcement of his contractual rights" is where the union has the sole power to invoke the higher stages of the grievance procedure, *and* "the employee-plaintiff has been prevented from exhausting his contractual remedies by the union's *wrongful* refusal to process the grievance." *Ibid.* An employee may maintain a § 301 suit under these circumstances because, in enacting the laws imposing a duty of fair representation on unions, Congress did not intend "to shield employers from the natural consequences of their breaches of bargaining agreements by wrongful union conduct in the enforcement of such agreements." *Id.*, at 186.

*Vaca* made clear that, with respect to an *employer*, the only consequence of a union's breach of a fair-representation duty to an *employee* is that it provides the employee with the means of defeating the employer's "defense based upon the failure to exhaust contractual remedies," *ibid.*, in a § 301 suit. The Court explicitly stated that the union's violation of its statutory duty in no way "exempt[ed] the employer from contractual damages which he would otherwise have had to pay," *id.*, at 196, and that the employer could not "hide behind the union's wrongful failure to act." *Id.*, at 197.

In *Hines* v. *Anchor Motor Freight, Inc.*, 424 U. S. 554 (1976), we reiterated that a union's breach of duty to an employee does not shield an employer from damages that it would otherwise owe. *Hines* involved employees whose grievances had been fully arbitrated. The arbitrator had upheld the discharge as rightful. Nevertheless, the Court held that the employee might still maintain a § 301 action *if* he could establish that his union had breached its duty of representing him fairly during the arbitral proceedings, even though the employer was in no way responsible for the alleged union malfeasance. *Id.*, at 569. The employer pro-

234

tested that, since its conduct during the arbitration was blameless, it should be able to rely on the finality of the arbitral award. We rejected this argument, pointing out that the employer had "surely played its part in precipitating [the] dispute" by discharging the plaintiff-employee in the first place. *Ibid.* As in *Vaca*, with respect to the employer, the only consequence of the union's breach was that it "remove[d] the bar" to the employee's right to bring a § 301 action.[3] 424 U. S., at 567.

Thus, under our previous holdings, as far as the employer is concerned, a union's breach of a fair-representation duty does no more than remove the procedural exhaustion-of-remedies bar to a § 301 suit by an aggrieved employee. The union's breach does not affect the employer's potential liability, including backpay liability, if the employee prevails in the § 301 judicial proceedings by showing that the employer had breached its contract in discharging him.

That the union is not primarily liable for backpay is readily apparent upon close inspection of the facts in *Vaca*. The employee in that case had been discharged in January 1960. Sometime after February 1961, the union refused to take the matter to arbitration, and, in February 1962, the employee filed suit, claiming that the union's refusal to go to arbitration violated his rights. The trial began in June 1964, and the matter was not finally adjudicated until this Court rendered its decision in February 1967. See *Vaca*, 386 U. S., at 173–176. Had the union opted in favor of arbitration, an

---

[3] Justice Stewart filed a two-paragraph concurring opinion in *Hines*, in which he stated that the employer should not be liable for backpay accruing between the time of the "tainted" arbitral decision and a subsequent "untainted" determination that the discharges were, after all, wrongful. 424 U. S., at 572–573. No other Member of the Court joined Justice Stewart's observations, and his opinion was founded on the employer's good-faith reliance on a favorable arbitral decision. Here, the Court goes far beyond Justice Stewart and grants the employer the right to rely on a nonexistent arbitration, even though the union is by no means under a duty to the employer to take any grievances to arbitration. See *infra*, at 239–241.

award almost certainly would have been forthcoming long be-
fore the judicial suit had even proceeded to trial.[4]   Never-
theless, the *Vaca* Court commented that "all or almost all" of
the employee's damages would be attributable to the em-
ployer, not the union.   *Id.*, at 198.   Had the Court intended
to hold the union responsible for backpay accruing after the
hypothetical arbitration date, presumably well over half of
this liability would have been attributed to the union.

Of course, this does not mean that the union escapes liabil-
ity for the "natural consequences," *Vaca*, *supra*, at 186, of *its*
wrongful conduct.   The damages that an employee may re-
cover upon proof that his union has breached its duty to rep-
resent him fairly are simply of a different nature than those
recoverable from the employer.   This is why we found in
*Vaca* that "damages attributable solely to the employer's
breach of contract should not be charged to the union, but in-
creases if any in those damages caused by the union's refusal
to process the grievance should not be charged to the em-
ployer."   386 U. S., at 197–198.

What, then, is the proper measure of the union's damages
in a hybrid § 301/breach-of-duty suit?   We considered this
question in *Czosek* v. *O'Mara*, 397 U. S. 25, 29 (1970), and
concluded that, under the *Vaca* rule, the union is liable in
damages to the extent that its misconduct "add[s] to the

---

[4] Statistics developed by the Federal Mediation and Conciliation Service
(FMCS) show that, in 1981, the average time between the filing of a griev-
ance and the rendering of an arbitral award was 230.26 days.   For the
years between 1972 and 1980, the average varied from a high of 268.3 in
1977 to a low of 223.5 in 1975 and 1978.   34 FMCS Ann. Rep. 39 (1981).
See generally Ross, The Well-Aged Arbitration Case, 11 Ind. & Lab. Rel.
Rev. 262 (1958); Seitz, Delay: The Asp in the Bosom of Arbitration, 36
Arb. J.(n. s.) 29 (Sept. 1981).   Also, in some industries, labor and manage-
ment have agreed to expedited arbitral proceedings that can further re-
duce the average time.   See Sandver, Blaine, & Woyar, Time and Cost
Savings through Expedited Arbitration Procedures, 36 Arb. J.(n. s.) 11
(Dec. 1981).

difficulty and expense of collecting from the employer."[5] *Czosek* reassured unions that they would not be forced to pay damages "for which the employer is wholly *or partly* responsible." 397 U. S., at 28–29 (emphasis added).

It is true that, under the *Vaca-Czosek* rule, the union may sometimes only have *de minimis* liability, and we unanimously acknowledged this fact in *Electrical Workers* v. *Foust*, 442 U. S. 42, 48, 50 (1979). "[T]he damages a union will be forced to pay in a typical unfair representation suit are minimal; under *Vaca*'s apportionment formula, the bulk of the award will be paid by the employer, the perpetrator of the wrongful discharge, in a parallel § 301 action." *Id.*, at 57 (BLACKMUN, J., concurring in result, joined by BURGER, C. J., and REHNQUIST and STEVENS, JJ.). The *Foust* majority nevertheless reaffirmed *Vaca* and, moreover, further insulated unions from liability by holding that punitive damages could not be assessed in an action for breach of the duty of fair representation. In reaching these conclusions, the Court relied on the policy of affording individual employees redress for injuries caused by union misconduct without compromising the collective interests of union members in protecting limited union funds. As in *Vaca*, considerations of deterrence were deemed insufficient to risk endangering union "financial stability." 442 U. S., at 50–51.[6]

---

[5] *Czosek* arose under the Railway Labor Act (RLA), 45 U. S. C. § 151 *et seq.* (1976 ed. and Supp. IV), which permits an employee whose union fails to process his grievance to press it himself. §§ 153 First (i), (j) (1976 ed., Supp. IV). The Court seeks to limit *Czosek* to the RLA context, on the theory that, because the employee in *Czosek* could have filed a grievance without union assistance, the union's default in that case did not "increase the damages that the employer otherwise would have had to pay." *Ante*, at 228–230. However, the *Czosek* opinion nowhere suggests that this distinction is relevant, and it cites only *Vaca* in support of its finding on this point. We reaffirmed in *Electrical Workers* v. *Foust*, 442 U. S. 42, 50, n. 13 (1979), that the *Czosek* rule was an application of "*Vaca*'s apportionment principle."

[6] Even though *Foust* requires that punitive damages not be assessed against a union, the *Vaca* rule nevertheless provides for a credible deterrent against wrongful union conduct. Attorney's fees and other litigation

## II

Our precedents notwithstanding, the Court today abandons the *Vaca* rationale and holds that a union's breach of duty does far more than simply remove the exhaustion defense in an employee's § 301 suit against his employer. The union's breach, even if totally unrelated to the employer's decision to terminate the employee, now serves to insulate the employer from further backpay liability, as of the hypothetical arbitration date, even though the employer, unlike the union, can stop backpay accretion at any moment it desires, simply by reinstating the discharged employee.

It cannot be denied that, contrary to *Vaca* and its progeny, under the Court's new rule, the "bulk of the award" for backpay in a hybrid § 301/breach-of-duty suit will have to be borne by the union, not the employer. In the present case, for example, the jury, which was instructed in accordance with the Court's new test, assessed $30,000 in compensatory damages against the union, and only $17,000 against the employer. The union should well consider itself fortunate that this dispute proceeded to trial less than three years after the cessation of petitioner Bowen's employment. Most of the cases of this nature that have been reviewed by this Court have taken the better part of a decade to run their course.[7]

---

expenses have been assessed as damages against unions, because such damages measure the extent by which the union's breach of duty adds to the difficulty and expense of collecting from the employer. See, *e. g., Seymour* v. *Olin Corp.*, 666 F. 2d, at 215; *Scott* v. *Teamsters Local 377*, 548 F. 2d 1244 (CA6), cert. denied, 431 U. S. 968 (1977).

[7] See, *e. g., Clayton* v. *ITT Gilfillan*, 623 F. 2d 563, 565 (CA9 1980), rev'd in part *sub nom. Clayton* v. *Automobile Workers*, 451 U. S. 679 (1981) (discharge in February 1975; we remand for trial in May 1981); *Electrical Workers* v. *Foust, supra*, at 43–45 (discharge in February 1971; trial in May 1976; Court of Appeals' judgment in 1978; this Court rules in 1979); *Hines* v. *Anchor Motor Freight, Inc.*, 424 U. S., at 556–559 (discharges in 1967; District Court grants summary judgment in 1973; we remand for trial in March 1976); *Czosek* v. *O'Mara*, 397 U. S., at 26 (discharge in 1962; we remand for trial in February 1970); *Vaca* v. *Sipes*, 386 U. S., at 175–176 (discharge in January 1960; trial begins in June 1964).

Because the hypothetical arbitration date will usually be less than one year after the discharge, see n. 4, *supra*, it is readily apparent that, under the Court's rule, in many cases the union will be subject to large liability, far greater than that of the employer, the extent of which will not be in any way related to the union's comparative culpability. Nor will the union have any readily apparent way to limit its constantly increasing liability.[8]

Bowen and the Postal Service argue that the employer is not the "cause" of an employee's lost earnings after the date on which an arbitral decision would have reinstated or otherwise compensated the employee. In the "but for" sense, of course, this is patently false, as the Court concedes. *Ante*, at 223. But for the employer's breach of contract, there would be no occasion for *anyone* to reimburse the plaintiff for lost wages accumulated either before or after a hypothetical arbitration. Furthermore, the consequences of the breach—the discharge without cause—continue to accumulate as long as the employer refuses to reinstate. The union's failure to arbitrate does not make the discharge and the refusal to reinstate any less wrongful.

Thus, there is no reason why the matter should not be governed by the traditional rule of contract law that a breaching defendant must pay damages equivalent to the total harm suffered, "even though there were contributing factors other than his own conduct." 5 A. Corbin, Contracts § 999 (1964). The plaintiff need not show the proportionate part played by the defendant's breach of contract among all the contributing factors causing the injury, and his loss need not be "segregated proportionately." *Ibid.* We followed this rule in *Czosek*, when we determined that an employer must pay the damages if it is "wholly or partly" responsible for the

---

[8] While remaining disturbingly vague about the point, the Court at least concedes that a union may shift some or all backpay responsibility back to the employer by "bring[ing] its default to the employer's attention." *Ante*, at 227, n. 15.

plaintiff-employee's loss. 397 U. S., at 29. Even if the union did not stop the employer from persisting in its breach of contract, as it might have done, conduct of this nature is hardly sufficient to exonerate the employer.

It bears reemphasizing that both before and after the hypothetical arbitration date, the union did not in any way prevent the employer from reinstating Bowen, and that the employer could reinstate him. Under these circumstances, it is bizarre to hold, as the Court does, that the relatively impotent union is *exclusively* liable for the bulk of the backpay. The Court, in effect, sustains the employer's protest to the union that "you should be liable for all damages flowing from my wrong from and after a certain time, because you should have caught and rectified my wrong by that time." *Seymour* v. *Olin Corp.*, 666 F. 2d 202, 215 (CA5 1982). The employer's wrongful conduct clearly was the generating cause of Bowen's loss, and only the employer had the continuing ability to right the wrong and limit liability by reinstating Bowen. The employer has the sole duty to pay wages, and it should be responsible for all back wages to which Bowen is entitled.

The Court finds that its apportionment rule is "consistent with the union's commitment to the employer under the arbitration clause" of the collective-bargaining agreement. *Ante*, at 227–228. However, the Court in no way identifies a legitimate source of the union's "commitment under the arbitration clause" that it will bear exclusive liability for post-arbitration-date backpay. The Court's finding is grounded on the assumption that the collective-bargaining agreement somehow entitles the employer to rely on the union to bring any wrongful discharge to its attention within the context of the grievance machinery. But the typical collective agreement, including the one here, contains no language entitling the employer to such reliance. The agreement gives the union the *right* to raise grievances, but it does not *obligate* it to do so. And, most assuredly, the agreement in no way ex-

pressly or impliedly grants the employer any rights against the union if the union fails to bring a meritorious grievance to its attention.

Indeed, it is only the union's *statutory* duty—implied by the judiciary[9]—to *employees* to provide them with fair representation that in any way obliges the union to take certain grievances to the employer for consideration. The duty of fair representation obliges a union "to make an honest effort to serve the interests of all [bargaining unit] members" fairly and impartially. *Ford Motor Co.* v. *Huffman*, 345 U. S. 330, 337 (1953); *Wallace Corp.* v. *NLRB*, 323 U. S. 248, 255 (1944); *Steele* v. *Louisville & Nashville R. Co.*, 323 U. S. 192, 202–203 (1944). It serves as a "bulwark to prevent arbitrary union conduct *against individuals* stripped of traditional forms of redress by the provisions of federal labor law." *Vaca*, 386 U. S., at 182 (emphasis added). The union owes this duty of fair representation to the employees it represents—the duty does not run to the employer, and the Court does not contend otherwise.

Accordingly, neither the collective-bargaining agreement nor the union's duty of fair representation provides any support for the Court's conclusion that the union has somehow committed itself to protect the employer, and that the employer has the right to rely on the union to cut off its liability. Contrary to our past cases construing the federal labor law, the Court in effect reads an indemnification provision into the collective-bargaining agreement, even though the employer can and more properly should be required to bargain for such

---

[9] Although no statute expressly imposes a duty of fair representation upon unions, we have held, beginning with *Steele* v. *Louisville & Nashville R. Co.*, 323 U. S. 192 (1944), that "the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca*, 386 U. S., at 177. See generally Aaron, The Duty of Fair Representation: An Overview, in The Duty of Fair Representation 8 (J. McKelvey ed. 1977).

a provision, if desired.[10]    It is a basic tenet of national labor policy that "when neither the collective-bargaining process nor its end product violates any command of Congress, a federal court has no authority to modify the substantive terms of a collective-bargaining contract." *United Mine Workers Health & Retirement Funds* v. *Robinson*, 455 U. S. 562, 576 (1982).    See also *Carbon Fuel Co.* v. *Mine Workers*, 444 U. S. 212, 218–219 (1979); *Porter Co.* v. *NLRB*, 397 U. S. 99, 108 (1970).[11]

The Court also contends, *ante*, at 226–227, that its rule will better enable grievance procedures to provide the uniform and exclusive method for the orderly settlement of employee grievances, because a contrary rule "could well affect the willingness of employers to agree to arbitration clauses as they are customarily written."    Why the Court's rule will not "affect the willingness" of *unions* to agree to such clauses is left unexplained.    More importantly, since the practical consequence of today's holding is that unions will take many unmeritorious grievances to arbitration simply to avoid expo-

[10] See Edwards, Employers' Liability for Union Unfair Representation: Fiduciary Duty or Bargaining Reality?, 27 Lab. L. J. 686, 691–692 (1976).

[11] The Court correctly reaffirms, *ante*, at 224, that a collective-bargaining agreement "is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." *Steelworkers* v. *Warrior & Gulf Navigation Co.*, 363 U. S. 574, 578 (1960). This means that "[g]aps may be left to be filled in by reference to the practices of the particular industry and of the various shops covered by the agreement," because "[m]any of the specific practices which underlie the agreement may be unknown, except in hazy form, even to the negotiators." *Id.*, at 580–581. The Court does not suggest that the union is obliged by any "industry practice" to protect the employer from backpay liability, or that such an obligation can be inferred in any other way from the "gaps" in the agreement. The Court's holding therefore inserts a new substantive term into the agreement, which is precisely what we have forbidden the lower courts to do in our previous holdings. The Court's mere belief that an employer "should" be able to rely on the union because there is "no unfairness to the union in this approach," *ante*, at 226, is not a valid justification for the holding.

sure to the new breach-of-duty liability, the Court's rule actually impairs the ability of the grievance machinery to provide for orderly dispute resolution.

I thus cannot agree with the Court's judgment imposing backpay liability on the union. Lost wages are among the "natural consequences," *Vaca, supra,* at 186, of an employer's wrongful discharge of an employee. Precedent, equity, and national labor policy do not impose on the union primary responsibility for all backpay accruing after its failure to arbitrate.[12]

### III

There are at least two situations in which a union should bear some liability for backpay. First, as recognized in *Vaca,* the union and the employer may be jointly and severally liable where the union has affirmatively induced the employer to commit the alleged breach of contract. 386 U. S., at 197, n. 18. Second, even in a case such as this one, in which the union is not responsible for the discharge, the union should be secondarily liable. That is, if, due to a breach of duty by his union, an employee is unable to collect the backpay to which he is entitled from his employer, the entity primarily liable, he should then be entitled to collect from the union.[13]

---

[12] The Court asserts, *ante,* at 227, n. 15, that the view advanced in this dissent would allow the union and the employee "to agree to a settlement pursuant to which the union would acknowledge a breach of its duty of fair representation in exchange for the employee's undertaking to look to his employer for his entire recovery." I seriously doubt, however, that a union will lightly "concede" a breach of its fair-representation duty to bargaining unit employees, particularly since it may be liable for the plaintiff's costs of collection, including attorney's fees in not inconsiderable amounts. See n. 6, *supra.* Furthermore, the Court's position, by exposing the union to even greater liability, may well exert correspondingly greater pressure on the union to settle, with or without an acknowledgment of breach of duty, leaving the employer to defend the action alone.

[13] The Court takes the exact opposite tack. It holds that the union is primarily responsible for post-hypothetical-arbitration-date backpay, and that the employer is secondarily liable for this amount. *Ante,* at 223, n. 12.

This rule of primary and secondary liability prevails in the law of trusts, and should be equally applicable in the present context.[14]   Just as an individual employee may bring a suit for breach of contract against his employer if, but only if, the union has breached its duty of fair representation in determining not to pursue the grievance on the employee's behalf, a trust beneficiary may sue to enforce a contract entered into on his behalf by the trustee if, but only if, the trustee "improperly refuses or neglects to bring an action against the third person."   Restatement (Second) of Trusts § 282(2) (1959); G. Bogert & G. Bogert, Law of Trusts and Trustees § 869 (2d ed. 1982); 4 A. Scott, Law of Trusts § 282.1 (3d ed. 1967).   If the beneficiary is able to collect in full from the primary obligor, the trustee should not be monetarily liable. See, e. g., *Pollard* v. *Pollard,* 166 Cal. App. 2d 698, 701, 333 P. 2d 356, 357 (1959).   However, the trustee must pay if his wrongful action causes a loss to the beneficiary, such as where the claim was originally enforceable, but the obligor has become insolvent, or where the claim has become barred by the statute of limitations.   2 Scott, *supra,* § 177.

The Court of Appeals for the Fourth Circuit correctly applied a similar rule in the labor context in *Harrison* v. *United Transportation Union,* 530 F. 2d 558 (1975), cert. denied, 425 U. S. 958 (1976).   In that case, the plaintiff-employee's union breached its duty of fair representation by allowing the plaintiff's claim against the employer to become time-barred. The court held that, under these circumstances, the union should be responsible for the lost wages the plaintiff might have recovered from the employer but for the union's mis-

---

[14] It is not always proper to import common-law principles into federal labor law.   See *NLRB* v. *Hearst Publications, Inc.,* 322 U. S. 111, 120–129 (1944).   In the present context, however, the trust analogy appears to be appropriate.   See Cox, Rights under a Labor Agreement, 69 Harv. L. Rev. 601, 652 (1956); *Jenkins* v. *Wm. Schluderberg-T. J. Kurdle Co.,* 217 Md. 556, 559–560, 144 A. 2d 88, 90 (1958).

conduct. 530 F. 2d, at 562. See also *Nedd* v. *United Mine Workers of America*, 400 F. 2d 103, 106–107 (CA3 1968).

No such exception to the rule I would apply is applicable in this case. The union did not incite Bowen's discharge, and Bowen is able to recover in full from the Postal Service. Therefore, I would affirm the judgment of the Court of Appeals to the extent that it holds the union not liable for the backpay to which Bowen is entitled.

## IV

I disagree with the Court of Appeals, however, to the extent that it holds the Service not liable for the $30,000 assessed by the District Court against the union, thus precluding Bowen from recovering this amount from either defendant. The parties stipulated that Bowen lost approximately $47,000 in wages prior to trial.[15] The District Court, based upon the jury's special verdict,[16] found the employer liable for $17,000 of these damages, and the union liable for the remainder. Although the Court of Appeals held that Bowen's lost earnings were an exclusive obligation of the Service, the court, in a footnote belatedly added to its opinion, refused to amend the judgment and assess the Service for the $30,000 that the District Court erroneously charged against the union. This was done on the erroneous ground that Bowen did not file a cross-appeal against the Postal Service for the $30,000. 642 F. 2d 79, 82, n. 6 (CA4 1981).

[15] The parties stipulated that Bowen lost $45,389.87 in back wages and fringe benefits from the time of discharge until trial. 3 Record 315. Bowen's counsel misstated this figure as $47,000 in his closing argument, and the jury apparently acted on this basis. *Id.*, at 550. No party has complained of the $1,610.13 discrepancy.

[16] The union timely objected to the District Court's instructions to the extent they allowed the jury to apportion *any* compensatory damages to the union. *Id.*, at 611–612. The union renewed its objection in its motion for judgment notwithstanding the verdict, or in the alternative to alter or amend the judgment. 1 Record, Item 37, ¶ 2. The Court quotes the relevant material. See *ante*, at 215, n. 3.

The purport of *Vaca* v. *Sipes* is to provide employees with effective remedies to make them whole. 386 U. S., at 185–186. See *Electrical Workers* v. *Foust*, 442 U. S., at 48–49; *id.*, at 54 (BLACKMUN, J., concurring in result). The footnote added by the Court of Appeals had exactly the opposite effect: it deprived Bowen of his full recovery and did so in a procedurally questionable manner. The Court of Appeals found no infirmity in the total quantum of the District Court's judgment in Bowen's favor. It reversed only that aspect of the judgment that was of no real concern to Bowen, the apportionment of the burden of the award between the union and the Postal Service. Yet the Court of Appeals frustrated Bowen's entitlement to complete recovery by holding that Bowen's failure to appeal prevented the reopening of the award against the Postal Service.

Bowen had no cause to challenge this judgment. Under the law, he had no right to a joint and several liability award against the defendants. Because the "Union played no part in [the Postal Service's] alleged breach of contract and since [the Postal Service] took no part in the Union's alleged breach of duty, joint liability for either wrong would be unwarranted." *Vaca* v. *Sipes*, 386 U. S., at 197, n. 18. Thus, from Bowen's standpoint, apart from collectibility, the legal effect of the judgment could not have been improved. Whether or not he had some technical basis for appealing a judgment in his favor, neither the facts of this case nor the concerns of national labor policy required him to appeal to protect his judgment. To rule otherwise would impose upon appellate courts the burden of additional appeals from favorable decisions prosecuted by litigants attempting to insulate their judgments from actions like that taken here by the Court of Appeals. In this respect, the Court and I are in agreement. See *ante*, at 217–218, n. 7.

Accordingly, I would affirm the Court of Appeals' judgment that the union was not liable for backpay damages, but I would reverse the remainder of the judgment and remand

the case with instructions that the District Court be directed to enter judgment against the Postal Service for the entire amount of Bowen's backpay loss.

JUSTICE REHNQUIST, dissenting.

I have joined Parts I, II, and III of JUSTICE WHITE's opinion. However I have some doubt about the proposition advanced by Part IV of that opinion and by the Court, *ante*, at 217–218, n. 7.

The District Court entered judgment for Bowen in the amount of $52,954. It apportioned $30,000 of this amount against the Union, and $22,954 against the Postal Service. When it reversed the judgment against the Union, the Court of Appeals declined to increase the award against the Postal Service or to remand for a new trial. Because this Court has reversed the judgment of the Court of Appeals, its assertion that Bowen "should not have been deprived of the full amount of his compensatory damages because of his failure to cross-appeal," *ante*, at 218, n. 7, is *dictum*. Although the issue is not before us, I am writing separately to express my doubts about the soundness of this proposition.

The District Court observed that "there is authority suggesting that only the employer is liable for damages in the form of back pay," 470 F. Supp. 1127, 1130 (WD Va. 1979), and the decisions of the Courts of Appeals discussed both in JUSTICE WHITE's opinion and in the Court's opinion show at the very least that there was substantial doubt that a union could be held liable for damages such as those awarded by the District Court. Under these circumstances, Bowen could not reasonably think that he was in the sort of "safe harbor" which the Court's opinion and JUSTICE WHITE's opinion suggest. Appellate courts review judgments, and Bowen's judgment against the Postal Service was for $22,954.

Prudent plaintiff's counsel would have filed a conditional cross-appeal, seeking to increase the amount of that judgment if the Union were held not liable. This is because an "appellee may not attack the decree with a view either to en-

larging his own rights thereunder or of lessening the rights of his adversary, whether what he seeks is to correct an error or to supplement the decree with respect to a matter not dealt with below." *United States* v. *American Railway Express Co.*, 265 U. S. 425, 435 (1924).

It is not clear to me, and in light of the Court's disposition of the case I need not decide, whether the Court of Appeals acted properly in refusing to alter the judgment against the Postal Service, or whether it should have remanded to the District Court for further proceedings on the damages issue. It seems to me, however, that the disposition suggested by the Court and by Part IV of JUSTICE WHITE's opinion would permit plaintiffs to "attack" the judgment of the Court of Appeals in a way prohibited by authorities such as *American Railway Express, supra.*