Clarence **MIDDLETON**, Plaintiff,

v.

**CSX CORPORATION**, et al., **Defendants.**

Civ. A. No. 188–024.

United States District Court, S.D. Georgia, Augusta Division.

Sept. 2, 1988.

942

Charles L. Wilkinson, III, Augusta, Ga., for plaintiff.

James W. Purcell, Augusta, Ga., Clinton J. Miller, III, Asst. Gen. Counsel, United Transp. Union, Cleveland, Ohio, Norman J. Slawsky, Atlanta, Ga., for defendants.

## ORDER

ALAIMO, Chief Judge.

Clarence Middleton is a black railroad switchman employed by CSX Transportation, Inc., a division of CSX Corporation (collectively, "CSX"). He alleges that CSX (and its predecessor) conspired with his union and failed to provide him with employment benefits which have been provided to similarly situated white employees. Middleton claims his union breached its duty of fair representation; his employers breached the collective bargaining agreement ("CBA"); and that all defendants are liable for intentional racial discrimination, in violation of 42 U.S.C. § 1981, and conspiracy to violate the federal civil rights laws, 42 U.S.C. § 1985. The employer-defendants move to dismiss the claims against them, arguing that the Court lacks jurisdiction because Middleton has failed to exhaust administrative remedies as to the civil rights claims and has failed to seek arbitration of the CBA claim or, alternatively, that the allegations fail to state a claim for relief. For the following reasons, the motion will be denied.

## FACTS

In a complaint notable for its clarity and enumeration of specifics, Middleton alleges the following. Commencing in 1980, Middleton was employed by defendant Seaboard System Railroad, Inc. ("Seaboard"), as a switchman assigned to its Augusta yards. Switchmen at the yards are represented by the defendant United Transportation Workers ("UTU"), and UTU Local 674 was Middleton's exclusive collective bargaining representative for the time period relevant to this dispute.

In 1984, CSX acquired, among other railways, Seaboard and Georgia Railroad and merged their operations utilizing Seaboard's existing yards in Augusta. Pursuant to the Revised Interstate Commerce Act, 49 U.S.C. § 11347, the merger was approved contingent upon the employees being provided employment protection, known as the "New York Dock Conditions." *New York Dock Railway—Control—Brooklyn Eastern District Terminal*, 360 I.C.C. 60, *aff'd sub nom. New York Dock Railway v. United States*, 609 F.2d 83 (2d Cir.1979). Accordingly, New York Dock became a part of the CBA between the employers and the union.

The premise of these provisions is that an employee who is placed in a worse position because of the amalgamation is entitled to protective compensation for a period of time equal to his employment with the predecessor railway, up to a maximum of six years.

For approximately a year after the merger, employees from both railways were fully employed. However, in August 1985, CSX began reducing the hours worked by various employees. Middleton, along with several other workers—black and white—claimed that the reductions were due to the merger and sought compensation under New York Dock. Middleton made monthly claims from September 1985 through March 1987. He made his claims on forms supplied by the employers and in accordance with their instructions; however, Middleton's claims have not been approved.

Initially, the employers informed him that the applications were incomplete and that he needed additional information regarding pre-merger assignments which would enable them to develop his "test-period average." According to Middleton, however, that information was in the hands of the employers and was not available to the employees directly. Middleton sought UTU assistance.

Eventually, the UTU took over the claims of the switchmen, including Middleton's. Throughout 1986 and most of 1987, Middleton regularly corresponded with various employer and union representatives regarding his claims, and he continued to make new claims for each month he was employed.

On September 16, 1987, Middleton was informed, by a union representative, that the UTU had concluded handling the New York Dock claims but that Middleton's claims had been withdrawn. On October 2, a different UTU official explained that the UTU determined that, "based upon the documentation contained in [Middleton's] file, he had not been 'adversely affected by the coordination' and was therefore not entitled to benefits under New York Dock." Complaint, ¶ 72.

Middleton subsequently discovered that, in August 1987, the defendants had settled the claims of several white employees but not the claims by black employees. Middleton continued to seek relief through the UTU and requested that the union explain why the claims of the white employees had been settled and those of the blacks withdrawn. Specifically, he alleges that six white switchmen had their claims settled; that some received double recovery; that one of the six whites made his first claim in 1988 but was paid; and that six black switchmen had their claims withdrawn.

On February 7, 1988, the Secretary of the UTU General Committee of Adjustment (an additional defendant, and the UTU committee responsible for pressing the New York Dock claims) informed Middleton that his appeal of the committee's decision to withdraw his claims would be handled in accordance with the UTU constitution. Middleton alleges that such an appeal

would be futile. He filed the instant lawsuit on March 3, 1988.

In the unfair representation claim, he seeks damages and lost wages from the UTU in an amount equal to the benefits he would have received under New York Dock had his claims been pressed; he seeks the same from the employers in the breach of the CBA claim; and seeks special, general and punitive damages from all defendants in his claims under the civil rights statutes.

The employer-defendants, have not addressed the merits of Middleton's allegations; rather, they argue that the proper fora to present the claims against them are the arbitration panels referred to in New York Dock and the Boards of Adjustment created by the Railway Labor Act, 45 U.S.C. §§ 151, et seq.

DISCUSSION

By joining an unfair representation claim against his union with a breach of the CBA claim against his employer, Middleton has created a classic "hybrid" labor lawsuit under *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983).

The federal labor statutes do not explicitly provide for an unfair representation claim. Rather, a union's duty of fair representation, and the consequent cause of action for breach of that duty, arise primarily from the exclusive bargaining agency granted to the majority union, Railway Labor Act, 45 U.S.C. § 152; *see also* National Labor Relations Act ("NLRA") § 9, 29 U.S.C. § 159; the NLRA as a whole; the fiduciary duties embodied in the Labor Bill of Rights, Labor-Management Reporting and Disclosure Act ("LMRDA") § 101, 29 U.S.C. § 411; and the LMRDA as a whole. *See DelCostello, supra* at 164 n. 14, 103 S.Ct. at 2290; *Czosek v. O'Mara*, 397 U.S. 25, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970) (railway workers' unfair representation claim).

Simply stated, an employee's union owes him or her a duty to treat the employee *fairly* and, if the union acts in a "discriminatory, dishonest, arbitrary, or perfunctory fashion," that duty may be breached. *DelCostello, supra*, 462 U.S. at 164, 103 S.Ct. at 2290.

Notably, unfair representation claims were, in large part, developed to counteract the institutional racism of unions, particularly the railway unions, in the 1940's and 1950's. *See Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see generally* Annot., *Race Discrimination in Labor & Employment—Supreme Court Cases*, 28 L.Ed.2d 928.

In many situations, however, prevailing against the union may be a hollow victory for an employee. The union cannot be held liable for the damages arising out of the employer's breach of the CBA, *Bowen v. United States Postal Service*, 459 U.S. 212, 103 S.Ct. 588, 74 L.Ed.2d 402 (1983) (discussing the apportionment of damages between union and employer in a hybrid suit); *Vaca v. Sipes*, 386 U.S. 171, 196–97, 87 S.Ct. 903, 919–20, 17 L.Ed.2d 842 (1967) (discussed *infra*); nor can the union reinstate an employee discharged by the employer or force the employer to take any other action *vis a vis* the disgruntled employee-plaintiff. Thus, in claims which are premised on an employer's breach of the collective bargaining agreement *and* the union's failure to dutifully prosecute the employee's grievance, to be assured of complete relief, the employee must assert a claim for breach of the CBA against the employer.

Federal district courts, however, are not the preferred battlegrounds for dispute between employees and employers arising out of labor disputes. This is particularly true in the railroad industry, where Congress has developed a detailed procedure for resolution of labor disputes and vested primary jurisdiction in a series of Boards of Adjustment. Railway Labor Act, 45 U.S.C. §§ 152, 153 First (i). Moreover, where labor contracts call for arbitration of particular issues, there is a very strong federal policy preferring reference to arbitration. *Steelworkers v. American Manufacturing Company*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960).

At the same time, deference to arbitration and exhaustion of administrative remedies are not bromides which will be invoked

whenever labor contracts are at issue. Recognized defenses to using the "normal" channels include situations where (1) the conduct of the defendant repudiates the contractual provisions, *cf. Drake Bakeries v. Local 50, American Bakery & Confectionery Workers International, AFL-CIO*, 370 U.S. 254, 260–63, 82 S.Ct. 1346, 1350–52, 8 L.Ed.2d 474 (1962); (2) where a party can show that pursuing alternatives would be futile because the decision-making body is most likely biased, *Glover v. St. Louis–San Francisco Railway Company*, 393 U.S. 324, 329–31, 89 S.Ct. 548, 551–52, 21 L.Ed.2d 519 (1969); or (3) futility because the arbitration panel cannot render complete relief. *Id.* at 328, 89 S.Ct. at 550; *Vaca, supra.* Hybrid labor suits often present paradigmatic examples for excusing arbitration. *See, e.g., Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); *Glover, supra; Vaca, supra; see generally* Annot. *What Circumstances Justify Employee's Failure To Exhaust Remedies Provided In Collective Bargaining Agreement, etc.*, 52 A.L.R.Fed. 591 (hereinafter, *Failure to Exhaust*).

*Vaca* provides the genesis for the line of cases dealing with hybrid suits and exhaustion of alternative remedies. In *Vaca*, an employee was discharged for poor health. He sought his union's assistance in processing a grievance against his employer, and the union processed the claim through four of the five levels outlined in the CBA. The union, however, determined that the claim was without merit and did not submit the grievance to arbitration. The employee could not invoke arbitration individually because, under the CBA, the union had exclusive authority to demand arbitration on behalf of employee grievances.

The employee filed suit in state court against the union, alleging unfair representation. He prevailed and was awarded $7,000 compensatory damages (representing his lost wages) and $3,000 punitive damages. Although the Court held that the evidence was insufficient to sustain the award, failure to exhaust the grievance procedure did not bar the suit. Because the employer was not joined in the suit, in *dicta*, the Court stated:

> We think that another situation when the employee may seek judicial enforcement of his contractual rights arises if, as is true here, the union has sole power under the contract to invoke the higher stages of the grievance procedure, *and* if, as is alleged here, the employee-plaintiff has been prevented from exhausting his contractual remedies by the union's *wrongful* refusal to process the grievance. It is true that the employer in such a situation may have done nothing to prevent exhaustion of the exclusive contractual remedies to which he agreed in the collective bargaining agreement. But the employer has committed a wrongful discharge in breach of that agreement, a breach which could be remedied through the grievance process to the employee-plaintiff's benefit were it not for the union's breach of its statutory duty of fair representation to the employee. To leave the employee remediless in such circumstances would, in our opinion, be a great injustice....
>
> For these reasons, we think the wrongfully discharged employee may bring an action against his employer in the face of a defense based upon the failure to exhaust contractual remedies, provided the employee can prove that the union as bargaining agent breached its duty of fair representation in its handling of the employee's grievance.

*Vaca, supra*, 386 U.S. at 185–86, 87 S.Ct. at 914–15 (emphasis in the original).

In addition to ruling that the plaintiff did not establish a breach of the duty of fair representation, the Court provided a second rationale for reversing the judgment against the union, ruling that the union cannot be held liable for the damages attributable to the employer's breach. *Id.* at 195–97, 87 S.Ct. at 919–20. The Court noted that fashioning appropriate remedies for unfair representation suits can be difficult. After stating that compelling arbitration may be a viable remedy, the Court stated:

> But we see no reason inflexibly to require arbitration in all cases. In some cases, for example, at least part of the

employee's damages may be attributable to the union's breach of duty, and an arbitrator may have no power under the bargaining agreement to award such damages against the union. In other cases, the arbitrable issues may be substantially resolved in the course of trying the fair representation controversy. In such situations, the court should be free to decide the contractual claim and to award the employee appropriate damages or equitable relief.

*Id.* at 196, 87 S.Ct. at 920.

Numerous courts have relied on *Vaca* for creating a specific exception to arbitration procedures when hybrid suits are filed. *Cf. Hines, supra,* where the Court refused to allow the defendant-employer to rely on an arbitration *award* in a case where the plaintiff-employee adequately alleged union misfeasance (grossly inadequate investigation) in the handling of his claims before the arbitration panel. *See also Failure to Exhaust, supra* § 3[a].

The decisions generally require two predicates for the *Vaca* exception to come into play: (1) there must be a *bona fide* unfair representation claim, and (2) the union must be the exclusive employee agency for invoking arbitration. The rationale for focusing on whether or not the union has the exclusive power to invoke arbitration is that, if the employee can invoke arbitration individually, arbitration is a viable alternative irrespective of the union's failure to pursue the claims. Because the employer bargained for arbitration, coupled with the strong policy favoring arbitration, arbitration is required. *Id.* § 3[b]. *But see Hines, supra,* 424 U.S. at 557 n. 2, 96 S.Ct. at 1053 n. 2 (it is not clear whether the union had *exclusive* authority to invoke arbitration).

### Arbitration Under New York Dock

As noted, when the merger of the railroads was approved, the provisions of New York Dock were engrafted into the CBA. Article I, § 11 of New York Dock provides for arbitration:

In the event the railroad and its employee or their authorized representatives cannot settle any dispute ... it may be referred by either party to an arbitration committee.

, The employer-defendants argue that this provision requires that Middleton's claim for breach of the CBA must be referred to an appropriate arbitration panel, relying primarily on *Atkins v. Louisville & Nashville Railroad Company,* 819 F.2d 644 (6th Cir.1987). In *Atkins,* 96 railway workers sued their employer in district court seeking benefits under New York Dock after their union refused to submit the claims to arbitration. Although the plaintiffs requested their union to invoke arbitration, there is no indication that the employees joined the union in an unfair representation claim for its failure to do so. The district court dismissed for lack of jurisdiction, holding that the claims must be arbitrated. The Sixth Circuit affirmed.

Plaintiffs argued, *inter alia,* that arbitration under Section 11 was permissive rather than mandatory and that arbitration would be futile because of the lengthy delay. The court disagreed.

In line with the majority of courts which had faced the issue (one circuit decision and several district court decisions), the Sixth Circuit ruled that arbitration under New York Dock is mandatory, *id.* at 649; and, relying on *Hoffman v. Missouri Pacific Railroad,* 806 F.2d 800 (8th Cir.1986), ruled that the power to invoke arbitration was vested both in the aggrieved employees, individually, as well as the union. *Id.* at 650. Because the individual employees could invoke arbitration, the court found the *Vaca* exception inapplicable and, on the facts of the case, affirmed the lower court's rejection of the futility argument.

Although *Atkins* is not controlling in this jurisdiction, the Court finds the decision reasonably persuasive.[1] Assuming, *ar-*

---

**1.** The Court is not completely convinced that the rulings in *Atkins* are correct and notes one anomaly in the decision. The arbitration clause states that disputes between the employer and "its employee *or* their authorized representative

*... may* be referred" to arbitration. To find that arbitration was mandatory, the court essentially held that "may" means "must"; yet at the same time, literally interprets the "or" to rule that the individual employee can invoke arbitra-

*guendo,* that the clause requires arbitration and that the employee can invoke it individually, the Court finds a ready and significant distinction between *Atkins* and the case at bar, and that is the simple fact that this is a hybrid lawsuit.

■ As noted, a significant aspect of *Vaca* is the Court's concern that the aggrieved employee is afforded a forum where he or she can obtain complete and meaningful relief. Under the facts of this case, Middleton has alleged collusion between his employer and his union, based on racism, which prevented him from obtaining benefits due under New York Dock. There is no indication that a panel empowered to hear the merits of the New York Dock claim against the employers could hear the unfair representation claim against the union, let alone apportion damages between the multiple defendants. Moreover, it is clear that an arbitration panel is powerless to hear the civil rights claims asserted by Middleton.

In the words of Justice White, this is "such a situation[ ] [where] the court should be free to decide the contractual claim and to award the employee appropriate damages or equitable relief." *Vaca, supra,* 386 U.S. at 196, 87 S.Ct. at 920.

*Civil Rights Claims/Boards of Adjustment*

■ Middleton's civil rights claims are based on 42 U.S.C. § 1981, which prohibits racial discrimination in the making and enforcing of contracts, and 42 U.S.C. § 1985, which provides penalties for conspiracies to violate the civil rights of others. The employers argue that these claims are subject to the *statutory,* as opposed to contractual, requirement that claims by railway employees against their employer proceed through the mediation and adjustment system enacted by Congress in the Railway Labor Act. The Court disagrees.

The Adjustment Boards have primary jurisdiction over "minor" claims, and resort to the Boards is mandatory and not merely permissive. *Andrews v. Louisville &*

*Nashville Railroad,* 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972). Again, the system of adjustment created by the Act embodies a strong federal policy of "promot[ing] stability in labor-management relations in this important national industry by providing effective and efficient remedies for the resolution of railroad-employee disputes." *Union Pacific Railroad v. Sheehan,* 439 U.S. 89, 94, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978).

At the same time, there is an equally strong federal policy of eradicating racial discrimination and affording victims of such discrimination meaningful access to the courts. *Conley, supra; Glover, supra.* An aspect of this policy is the rule that exhaustion of administrative remedies is not necessarily a predicate to maintaining a civil rights action. *Cf. Alexander v. Gardner–Denver Company,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (after submission to arbitration pursuant to the CBA, trial *de novo* is available in a Title VII action despite an arbitral decision that discharge was for cause); *Guerra v. Manchester Terminal Corporation,* 498 F.2d 641, 648 (5th Cir.1974) (§ 1981 action maintainable despite no exhaustion of NLRA requirements). Thus, it appears that this case presents a confluence of two equally important, yet seemingly contradictory, federal policies.

While the Supreme Court has reserved the specific question of whether railroad employees must exhaust the remedies outlined in the Railway Labor Act before bringing a § 1981 claim against the employer, *Johnson v. Railway Express Agency,* 421 U.S. 454, 457 n. 3, 95 S.Ct. 1716, 1718 n. 3, 44 L.Ed.2d 295 (1975), lower courts have faced the issue and reached conflicting results. *Compare McAlester v. United Air Lines, Inc.,* 851 F.2d 1249 (10th Cir.1988) (§ 1981 claim not subject to Railway Labor Act limitations); *Pender v. National Railroad Passenger Corporation,* 625 F.Supp. 252 (D.D.C.1985) (Judge Gesell ruled that exhaustion was not required),

tion. It does seem inconsistent, at best, to be literal on one hand and interpolative on the

other when giving meaning to *one sentence.*

*with Evans v. Central of Georgia Railroad Company*, 619 F.Supp. 1364 (N.D.Ga. 1985) (Judge Moye ruled that exhaustion was required).[2] *Evans* is a thorough opinion and thoughtfully discusses whether a § 1981 suit constitutes a minor or major dispute under the terms of the Railway Labor Act, thoroughly discusses the policies underlying exhaustion and outlines the specific exceptions to exhaustion developed over the years.

In the final analysis, however, neither decision is controlling here. The significant feature of this case is that Middleton has alleged collusion between the union and the employer regarding a violation of his civil rights and has joined an unfair representation suit against his union. As such, it falls into the first exception to exhaustion discussed by Judge Moye in *Evans. Id.* at 1369 (outlining the *Vaca* exception as it relates to railway worker claims under *Conley* and *Glover*); *see also Czosek, supra.* In *Czosek*, the employees filed a hybrid suit. The district court dismissed the unfair representation claim, ruling that the allegations were insufficient, and dismissed the breach of the CBA claim against the employer for failure to exhaust. The Second Circuit reversed the dismissal of the unfair representation claim but affirmed the dismissal of the breach of the CBA claim. The union sought review, arguing, *inter alia,* that the employer was a necessary party to the employees' claim against it. Because, under *Vaca,* the union could only be liable for its portion of the damages attributable to its discriminatory conduct, the Supreme Court rejected the union's argument and affirmed.

Although not necessary to its decision, the Court described the Second Circuit's ruling regarding the employer, stating:

> The Court of Appeals permitted the railroad to be made a party to the suit if it is properly alleged that the discharge was a consequence of the union's discriminatory conduct or that the employer was in any other way implicated in the union's allegedly discriminatory action.

*Id.* 397 U.S. at 29, 90 S.Ct. at 773. Clearly, the Court approved of the procedure adopted by the Second Circuit, despite the employer's argument that the employees did not resort to arbitration. *Id.* at 28–30, 90 S.Ct. at 772–774.

It appears to this Court that *Czosek* forecloses the employers' argument that dismissal is mandated under the Railway Labor Act.

This conclusion is strengthened because Middleton cannot obtain complete relief through the Adjustment Boards and because it appears to this Court that seeking review by the Adjustment Boards has a high probability of being futile.

■■■ Unlike arbitration panels, which are typically chosen by the actual parties to the dispute, the Adjustment Boards are made up of representatives of the *unions* and employers. Because of the vested interest of the union representatives sitting on the Board, it is "beyond cavil" that the Boards lack the jurisdiction to hear the unfair representation claim, *id.* at 28, 90 S.Ct. at 772. It seems equally obvious that the courts must also recognize that, when unfair representation claims are asserted in conjunction with the CBA breach claim, a decision-making body consisting of union and employer representatives is inherently unlikely to consist of neutral fact finders to resolve the CBA portion of the claim.

Accordingly, the Court concludes that, in the instant case, the § 1981 and § 1985 claims are not subject to dismissal for failure to pursue the remedies of the Railway Labor Act.

CONCLUSION

Middleton has alleged a series of specific facts which support a claim that his employers, in collusion with his union, prevented him from obtaining benefits under New York Dock because he is black. Under the employers' arguments, he would be

---

**2.** Neither *Pender* nor *Evans* involved hybrid suits. Rather, in each, the plaintiff alleged specific discriminatory conduct by supervisors. In *Pender,* plaintiff alleged that he was suspended and then demoted based on racial reasons; and in *Evans,* plaintiff alleged he was harassed—for racial reasons—by the trainmaster.

required to argue the merits of his New York Dock claims in an arbitration tribunal, pursue the merits of his civil rights claims at the Adjustment Boards and litigate his unfair representation claim against the unions in federal court. Such a duplication of effort does not comport with common sense, nor is it required under controlling statutory and judicial authority. Accordingly, defendants' motion to dismiss is hereby DENIED.